Filed 2/9/15; unmodified opn. attached

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GRAND PROSPECT PARTNERS, L.P.,<br><br>  Plaintiff, Cross-Defendant and Respondent,<br><br>v.<br><br>ROSS DRESS FOR LESS, INC. et al.,<br><br>  Defendants, Cross-Complainants and Appellants. | F067327<br><br>(Super. Ct. No. VCU237296)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on January 12, 2015, be modified as follows:

1.  On page 41, after the first full paragraph, but before the Disposition, the following nonpublished section and paragraphs that follow are inserted:

VI.    ADDITIONAL ISSUES[*]

      A.    Unchallenged Jury Instructions

Grand Prospect's petition for rehearing contends this court cannot modify the judgment to eliminate damages that arose after Ross's purported termination of

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part VI.

[*]    See footnote, *ante,* page 1.

the Lease because any modification would be inconsistent with the unchallenged jury instructions. Grand Prospect argues that the correctness of the jury's verdict must be measured by the jury instructions because Ross had not challenged the instructions.

We reject this argument because Ross is not arguing an error in the damage instructions requires reversal or modification. Instead, Ross challenged the trial court's determination of liability for breach of contract and the court's underlying determination that the cotenancy provisions were unconscionable and an unenforceable penalty. Ross's agreement with the damage instruction cannot be interpreted as a concession that the trial court correctly decided liability and the underlying contested issues. Instead, the agreement means that Ross conceded the instructions were the proper way to present the damages question to the jury, *provided that the trial court correctly decided the previously contested issues relating to liability*.

Grand Prospect's reliance on cases in which an appellant claims a jury verdict is not supported by the evidence is not convincing because those cases are off point. Ross is challenging the trial court's determination of breach that came before the question of damages was presented to the jury, which is different from a claim that the verdict is not supported by the evidence. (See *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535.)

Furthermore, after the trial court determined a breach of contract had occurred because the cotenancy provisions were unconscionable and an invalid penalty, the court held a conference with the attorneys to determine what issues remained and how those issues should be determined. During that conference, the court indicated the parties need not revisit any issues resolved in his ruling on the unconscionability and penalty questions, but should address matters related to instructing the jury on damages and any other remaining issues. Counsel for Ross

2.

suggested not telling the jury about the court's ruling and submitting the issues of liability and damages to them with the instruction that they should answer the questions on damages regardless of their findings on liability. Counsel argued this method would create a full record for the court of appeal on what the jury would have done without the trial court's findings, "because obviously this is going to be an appellate issue." In response, the trial court stated: "We don't want to waste the time. And I can understand that argument because, clearly, the parties have an opportunity to have any decision I make reviewed .…" Earlier, the court referred to his elimination of the cotenancy provisions from the contract as being "long behind us" and he reiterated this point by stating the absence of the cotenancy provisions from the agreement and the breach of the Lease was "behind us."

This exchange makes clear that the trial court believed the correctness of his ruling was an issue that could be raised on appeal without further discussion and he wanted counsel to focus on how to move the case forward. In these circumstances, Ross's counsel was not required to annoy the trial court and waste time by making objections the trial court indicated were unnecessary to preserve the right to challenge his ruling on appeal.

In short, Ross was not required to object to damage instructions to preserve the claim that the trial court erred in ruling the cotenancy provisions were unconscionable and an unenforceable penalty.

B.    Material or Partial Breach

Grand Prospect contends that Ross could not exercise the termination provision because it had materially breached the Lease by not paying rent and already had been sued by Grand Prospect.

The fifth question in our request for supplemental letter briefs asked: "If the termination clause is not a penalty, can that clause be enforced as part of the Lease? This issue includes the topics of severance, central purpose, and material

3.

or immaterial (i.e., total or partial) breach, and retroactive breach. (See *Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1134 [partial breach does not give injured party the right to terminate contract].)"

Here, Ross's failure to pay rent was based on its reliance on the cotenancy provision allowing rent abatement, which had not yet been determined to be unenforceable. Although Ross did not pay rent, it conducted itself as if the Lease remained in force. In other words, the failure to pay rent and Ross's other acts and omissions cannot be interpreted as a repudiation of the Lease. (See *Gold Mining & Water Co. v. Swinerton* (1943) 23 Cal.2d 19, 29 [partial breach followed by repudiation of contract may be a total breach].)

We conclude Ross's failure to pay rent was a partial breach and, therefore, did not mean Ross could not rely on the other provisions of the Lease. First, Ross's failure to pay rent was in accordance with (not in violation of) the Lease as written. Second, each monthly payment of rent was a small part of the overall performance of the 10-year Lease. The first year's rent was 10 percent of the rent for the entire term of the Lease and each monthly payment was less than 1 percent of the total rent payable during the term of the Lease. Third, the consequences of concluding Ross committed a total breach of the Lease by relying on the rent abatement provision are greatly out of proportion to the liability Ross would have incurred if failing to pay rent was deemed a total breach. Based on these factors, we conclude as a matter of law that the breach from the failure to pay rent was a partial breach. (See *Brawley v. J.C. Interiors, Inc.*, *supra*, 161 Cal.App.4th at p. 1134.)

C.     Waiver

Grand Prospect contends that, even if the termination provision was otherwise valid, Ross waived any right to exercise the termination provision

because Ross, knowing Mervyn's would not be present, took possession of the premises and required Grand Prospect to expend funds on the premises.

California law defines waiver as the intentional relinquishment or abandonment of a known right or privilege. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745.) Consequently, waiver is based upon intent, which presents a question of fact. (*Ibid.*) The intent to waive may be expressed in words, either oral or written, or may be implied by a party's conduct. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)

Here, Grand Prospect argues, in effect, that an intention to waive may be inferred from Ross's conduct—namely, Ross taking possession of the store and requesting reimbursement of approximately $23,000 under a tenant's improvement allowance. We conclude this conduct is insufficient to create a triable issue of fact about Ross's intentions because, among other things, those intentions were expressed in writing. In a letter dated February 6, 2009, Ross advised Grand Prospect that it accepted delivery of the store "subject to all its rights under the Lease, including the Required Co-Tenancy provisions of Section 6.1.3." This explicit and unambiguous reservation of rights demonstrates that Ross did not intend to relinquish its rights under the cotenancy provisions by taking possession.

D.    Severing Termination from Rent Abatement

Grand Prospect contends that the trial court's decision to treat the cotenancy provisions as a whole, and not sever the rent abatement provision from the termination provision, should be reviewed for an abuse of discretion and this court should conclude no abuse of discretion occurred.

Assuming the abuse of discretion standard of review applies and the trial court made an implied determination the cotenancy provisions regarding rent

5.

abatement and termination were not severable, we conclude that implied determination constitutes an abuse of discretion.

Generally, whether a contract is separable depends upon its language and subject matter and severability is a question of construction to be determined by the court according to the intention of the parties. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 122 (*Armendariz*).) Section 26.1 of the Lease states:

> "If any term, covenant, condition, provision or restriction of this Lease is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby."

This provision is an unambiguous expression of the intentions of the parties on the question of severability. Assuming that a clear expression of intent is overridden when the illegal portion of a contract permeates the entire contract or the provisions in question (*Armendariz*, *supra*, 24 Cal.4th at pp. 122-124), we next consider whether the penal nature of the rent abatement clause permeated the cotenancy provisions and required the invalidation of the termination provision.

The rent abatement provision and the termination provision served two different purposes and each was able to operate without the other. Accordingly, we conclude the unenforceability of the rent abatement provision does not permeate the cotenancy provisions of the Lease or, more narrowly, the termination provision.

Therefore, the rent abatement provision was severable from the termination provision and the opposite determination would have been contrary to the expressed intentions of the parties and the rules governing when a clause or provision permeates an agreement.

E.    Termination as a Forfeiture

Grand Prospect's petition for rehearing also argues that the termination of the Lease was a forfeiture and, therefore, should be subject to analysis under the rules that define whether a provision is an invalid penalty. We will adhere to our earlier conclusion that the specific rule of law applicable to termination provisions in commercial leases applies to the facts of this case and, therefore, an analysis of whether the termination operated as a penalty is not required.

Furthermore, the doctrine of implied findings does not preclude this court from applying the specific rule for termination provision in this case because the facts relevant to the application of the rule are undisputed.

F.    Attorney Fees

Ross's petition for rehearing contends the disposition of this appeal should not bar it from requesting the trial court to reconsider its award of attorney fees in light of the substantial modification of the judgment.

*1.    Background*

Section 20.4.2 of the Lease states in part: "If either party commences an action against the other party arising out of or in connection with this Lease, … the prevailing party shall be entitled to have and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs and discovery costs, including costs of appeal."

Civil Code section 1717, subdivision (a) states that in any action on a contract specifically providing for an award of attorney fees and costs to the prevailing party, "then the party who is determined to be the party prevailing on the contract, … shall be entitled to reasonable attorney's fees in addition to other costs."

Grand Prospect's memorandum of points and authorities in support of its motion for attorney fees pursuant to Civil Code section 1717 asserted it must be regarded as the prevailing party because the $3.8 million jury verdict was an

7.

unqualified victory on its breach of contract claims. As to the amount of fees requested, Grand Prospect stated it sought only lodestar attorney fees—that is, an amount equal to the time spent multiplied by the reasonable hourly rate of each attorney involved. Grand Prospect requested fees for attorney time spent through the time of filing the motion that totaled $807,195.68 and also sought to recover $52,348 paid to a paralegal, Paul Coleman of Mallegan Data Management.

Grand Prospect's motion also referenced a settlement reached in a related case that had been transferred to Tulare County for consolidation. The settlement document does not appear to be part of the appellate record, but Grand Prospect's memorandum of points and authorities described it by stating:

"The parties agreed that the prevailing party in this action would recover 100 percent of attorney fees incurred in connection with the entire dispute prior to April 21, 2011 (the filing of the *Ross v. Marshall* complaint); 92.5 percent of the attorney fees incurred from April 21, 2011, through April 27, 2012 (the date of the settlement); and 100 percent of attorney fees incurred after April 28, 2012. (See Declaration of Hillison.)"

Grand Prospect also stated that its fee request reflected the 7.5 percent reduction applied to all fees incurred from April 21, 2011, through April 27, 2012.

The trial court's April 3, 2013, order did not explicitly identify the number of hours it considered reasonable or the reasonable hourly rates for the attorneys. Instead, it addressed the components of Ross's challenge to $78,010.38 of the attorney fees requested. The challenges related to amounts incurred before the lawsuit was filed and the fees for the paralegal services of Mr. Coleman. The trial court disagreed with the challenges, allowing a recovery of $77,035.28 of the amount challenged and awarding the balance of the fees sought. The amended judgment identified the amount of attorney fees awarded as $829,930.00. Because Grand Prospect requested only an award of the lodestar amount, we conclude the $829,930.00 is the trial court's determination of that amount.

8.

## 2. *Prevailing Party*

Ross argues it should be allowed on remand to seek a redetermination of whether Grand Prospect is the prevailing party for purposes of Civil Code section 1717. We disagree.

Under subdivision (b)(1) of Civil Code section 1717, "the prevailing party on the contract shall be the party who recovered a greater relief in the action on the contract." Although "greater relief" is not necessarily the same as a "net monetary recovery" (7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 194, p. 745), the recovery of damages in the amount of $672,100 compels the conclusion that Grand Prospect is the prevailing party in this contract action. This case does not involve payments from other sources that would permit the trial court to conclude that, despite an award of damages to the plaintiff, a defendant is the prevailing party. (See *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136 [defendant was the prevailing party even though plaintiff was awarded over $67,000]; cf. *Eicher v. Advanced Business Integrators, Inc.* (2007) 151 Cal.App.4th 1363 [damages reduced on appeal, attorney fee award affirmed in full].)

Therefore, on remand, the trial court shall treat Grand Prospect as the prevailing party for purposes of Civil Code section 1717, unless the settlement agreement includes a definition of that term and indicates the parties intended their definition to be applied to any attorney fees motion in this case.

## 3. *Amount of Fees—Adjustment*

Ross also argues that, even if Grand Prospect is deemed the prevailing party, Ross is entitled to have the trial court reconsider whether the amount of attorney fees should be reduced in light of the modification of the judgment. Ross asserts this reevaluation of the original award will not unduly burden the trial court because Grand Prospect is likely to file a motion seeking attorney fees after the remittitur issues.

In *Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano III*), the Supreme Court approved the lodestar adjustment method for determining reasonable attorney fees. First, the trial court calculates the lodestar figure by "a careful compilation of the time spent and the reasonable hourly compensation of each attorney … involved in the presentation of the case." (*Id*. at p. 48.) In other words, the trial court calculates the lodestar amount by multiplying "the number of hours reasonably spent" by "the reasonable hourly rate for each billing professional." (1 Pearl, Cal. Attorney Fees Awards (Cont.Ed.Bar 2014) § 8.1, p. 8-2.)

In cases involving contractual attorney fees and Civil Code section 1717, once the lodestar figure is calculated, the amount "may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM*); see *Serrano III*, *supra*, 20 Cal.3d at p. 49.) In the present case, the $829,930.00 in attorney fees awarded by the trial court is the lodestar amount. The amount is very close to that requested by Grand Prospect as the lodestar amount and Ross did not argue for any adjustments to the lodestar amount.

The adjustments, if any, to the lodestar amount are determined by the trial court based on its consideration of "'a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, *the success or failure*, and other circumstances in the case.' [Citation.]" (*PLCM*, *supra*, 22 Cal.4th at p. 1096, italics added.) In the present case, the trial court had no reason to consider a downward adjustment due to partial success because (1) Grand Prospect achieved a full recovery; (2) the settlement agreement might have included terms that would have overridden the need for any adjustment; and (3) Ross did not argue for a downward adjustment of the lodestar amount.

10.

Ross's petition for rehearing contends "an important factor—'success or failure'—has changed dramatically as a result of the Opinion." As a result, Ross argues it is entitled to ask the trial court to reconsider the fee award. Ross's arguments have not addressed what role, if any, the settlement agreement referenced Grand Prospect's moving papers might have on any reconsideration of the amount of the fee award.

Based on Ross's arguments and the state of the appellate record, we reach the following conclusions.

First, the terms of the settlement agreement referenced in Grand Prospect's motion for attorney fees *might* affect whether the lodestar amount is subject to adjustment under the factors listed in *PLCM*, *supra*, 22 Cal.4th at page 1096. The record does not allow this court to resolve this issue and, therefore, it must be decided in the first instance by the superior court judge assigned to this case on remand.

Second, assuming the terms of the settlement agreement do not preclude an adjustment to the lodestar amount, Ross should be given the opportunity to argue that Grand Prospect's partial or limited success on the contract claim justifies a downward adjustment of the lodestar amount. (*PLCM, supra*, 22 Cal.4th at p. 1096.) If Grand Prospect initially had recovered only the rent abatement and the settlement agreement did not preclude such an argument, Ross would have been able to pursue this argument back in 2013 when it opposed Grand Prospect's motion for attorney fees. Therefore, we conclude Ross can pursue this argument on remand.

Third, the change, if any, in the amount of the attorney fees awarded on remand should be limited to a reduction based on Grand Prospect's success or failure. The applicable principle set forth in *PLCM* indicates that the success or failure achieved is a factor considered *after* the lodestar amount is calculated.

11.

Here, the superior court judge who presided at trial and determined the lodestar amount is deceased. As a result, the judicial officer most familiar with the case is not available to reconsider the award of attorney fees. Because the original trial judge is not available and Ross's argument regarding the amount of the award relates to a factor—success or failure—considered after the lodestar calculation, we conclude the original lodestar calculation of $829,930.00 need not be revisited on remand. Instead, the judge assigned this case on remand need consider only whether to adjust the lodestar calculation based on the change in Grand Prospect's level of success resulting from this court's modification of the judgment.

Fourth, the amount of the adjustment, if any, to the lodestar amount is committed to the discretion of the trial court. This court is not able to provide definitive guidance on the rules of law that should be applied by the trial court in exercising that discretion. If *PLCM* is interpreted as setting forth the framework for analyzing adjustments, the trial court's discretion might be relatively unfettered. Alternatively, the analysis of Grand Prospect's partial or limited success might be subject to an analysis like the two-step inquiry set forth by the United States Supreme Court in *Hensley v. Eckerhart* (1983) 461 U.S. 424 for attorney fees requests in federal civil rights actions. (See 2 Pearl, Cal. Attorney Fees Awards (Cont.Ed.Bar 2014) § 10.52, pp. 10-54 to 10-55.) We note for counsel and the trial court that whether the *Hensley* approach applies to a claim for contractual attorney fees under Civil Code section 1717 is an open question. (*In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 589, fn. 8.) Counsel, if they choose, may present argument on this legal question to the trial court on remand.

Fifth, the trial court's exercise of its discretion regarding any adjustments to the lodestar calculation of attorney fees should not be influenced by this court's determination that each side shall bear its own costs on appeal.

In summary, the question of whether the $829,930.00 in attorney fees awarded in the amended judgment should be adjusted will be remanded for further proceedings in accordance with this opinion.

2. On page 41 the entire two paragraphs of the Disposition are deleted and the following two paragraphs are inserted in their place.

The amended judgment filed April 18, 2013, is modified such that the reference to "the sum of $3,785,714.86" shall be reduced to "the sum of $672,100.00" and the matter is remanded for further proceedings in accord with this opinion regarding the award of attorney fees. After those proceedings, the trial court shall make appropriate modifications, including replacing the amended judgment's reference to "a total award of $4,701,990.83" with an amount that reflects the damage award of $672,100 plus the attorney fees awarded by the trial court on remand.

The parties shall bear their own costs on appeal.

This modification changes the judgment.

Respondent's petition for rehearing filed on January 27, 2015 is denied.

Appellant's petition for rehearing filed on January 28, 2015 is denied.

_____
Franson, J.

WE CONCUR:

_____
Kane, Acting P.J.

_____
Peña, J.

13.

Filed 1/12/15; unmodified version

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GRAND PROSPECT PARTNERS, L.P., <br><br> Plaintiff, Cross-Defendant and Respondent, <br><br> v. <br><br> ROSS DRESS FOR LESS, INC. et al., <br><br> Defendants, Cross-Complainants and Appellants. | F067327 <br><br> (Super. Ct. No. VCU237296) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County. Paul A. Vortmann, Judge.

Arnold & Porter, Sean M. SeLegue, Jerome B. Falk, Jr., Jeremy McLaughlin; Bartko, Zankel, Bunzel & Miller, Benjamin K. Riley, Simon R. Goodfellow; Dowling Aaron, Donald R. Fischbach and Steven M. Vartabedian for Defendants, Cross-Complainants and Appellants.

Bingham McCutchen, Stephen Zovickian and Robert A. Brundage; Caswell Bell & Hillison, Robert K. Hillison and Kimberly L. Mayhew for Plaintiff, Cross-Defendant and Respondent.

Caldwell Leslie & Proctor, Christopher G. Caldwell, Michael D. Roth and Albert Giang for California Retailers Association, The Gap, Inc., Bed Bath & Beyond Inc., H&M Hennes & Mauritz L.P., Petco Animal Supplies, Inc., and VF Outdoor, Inc. as Amicus Curiae on behalf of Defendants, Cross-Complaints and Appellants.

-ooOoo-

This appeal addresses whether cotenancy provisions[1] in a lease for retail space in a shopping center are unconscionable or unreasonable penalties and, thus, not binding on the landlord. The enforceability of cotenancy provisions has not been discussed in an opinion published by a California appellate court. This opinion does not establish a categorical rule of law holding cotenancy provisions always, or never, are enforceable. Instead, it illustrates that the determination whether a cotenancy provision is unconscionable or an unreasonable penalty depends heavily on the facts proven in a particular case. Here, the facts show the provisions were not unconscionable and only the rent abatement provision operated as an unreasonable penalty.

Grand Prospect Partners, L.P. (Grand Prospect), the owner and operator of the Porterville Marketplace shopping center, filed this action to challenge the enforceability of provisions in its commercial lease with Ross Dress For Less, Inc. (Ross). The provisions conditioned Ross's obligation to open a store and pay rent on Mervyn's operating a store in the shopping center on the commencement date of the lease, and also granted Ross the option to terminate the lease if Mervyn's ceased operations and was not replaced by an acceptable retailer within 12 months.

The opening cotenancy condition was not satisfied because Mervyn's filed for bankruptcy and closed its store in 2008. As authorized by the lease, Ross took possession of the space, never opened for business, never paid rent, and terminated the lease after the 12-month cure period expired.

Grand Prospect claims Ross was obligated to pay rent for the full 10-year term of the lease because the provisions authorizing rent abatement and termination were unconscionable or, alternatively, an unreasonable penalty and thus unenforceable. The

---

[1]      Lease provisions that require other stores in a shopping center to be occupied by operating businesses generally are referred to as cotenancy requirements or conditions. (See 1 Retail Leasing: Drafting and Negotiating the Lease (Cont.Ed.Bar 2013) ch. 7, pp. 7-1 to 7-29 (*Retail Leasing*).)

trial court agreed with both theories, found Ross had breached the lease by failing to pay rent and terminating the lease, and directed the jury to determine the amount of damages resulting from each breach. The jury awarded $672,100 for unpaid rent and approximately $3.1 million in other damages caused by the termination.

Ross appealed, contending the cotenancy provisions in the lease were not procedurally and substantively unconscionable and were not an unreasonable penalty.

As to unconscionability, which requires proof of both procedural and substantive unconscionability, we conclude the evidence establishes there was no procedural unconscionability. The parties were sophisticated and experienced in the negotiation of commercial leases for retail space, their negotiations involved several drafts of the letter of intent and subsequent lease, and Grand Prospect's decision to approach Ross first about renting the space was a free and unpressured choice. Ross's insistency on cotenancy provisions during negotiations did not make the lease a contract of adhesion or otherwise deprive Grand Prospect of a meaningful choice.

As to unreasonable penalties, the rent abatement and termination provisions must be examined separately because they involve separate consequences triggered by different (albeit partially overlapping) conditions. As a general rule, a contractual provision is an unenforceable penalty under California law if the value of the property forfeited under the provision bears no reasonable relationship to the range of harm anticipated to be caused if the provision is not satisfied.

Here, the trial court's determination that the rent abatement provision constituted an unreasonable penalty is supported by its findings of fact that (1) Ross did not anticipate it would suffer any damages from Mervyn's not being open on the lease's commencement date and (2) the value of rent forfeited under the provision was approximately $39,500 per month. There is no reasonable relationship between $0 of anticipated harm and the forfeiture of $39,500 in rent per month and, therefore, the trial court correctly concluded the rent abatement provision was an unenforceable penalty.

As to the lease termination provision, California courts have adopted a specific rule that holds no forfeiture results from terminating a commercial lease based upon the occurrence of contingencies that (1) are agreed upon by sophisticated parties and (2) have no relation to any act or default of the parties. These facts are present in this case and, therefore, the rule compels the conclusion that the termination provision did not constitute a forfeiture. Because no forfeiture occurred as a result of the termination, the termination provision did not create an unreasonable penalty.

We therefore modify the judgment to award damages only for unpaid rent.

## FACTS

*The Parties*

Ross is the nation's largest retailer of off-price apparel and home fashion. The trial court found Ross had more than 259 stores in California and more than 1,000 stores nationwide. In 2008, Ross's annual sales totaled more than $6.4 billion.

Grand Prospect is a California limited partnership. Its sole asset is a shopping center named the Porterville Marketplace, located in Porterville, California.

Grand Prospect is managed by David H. Paynter, its sole general partner. Paynter received a bachelor's degree in business administration, majoring in finance. At the time of trial, he had over 33 years of experience in real estate. In 1998, Paynter formed his current company, Paynter Realty and Investments, which is based in Tustin, California. Paynter Realty and Investments is involved in both development of shopping centers and managing those properties. Paynter testified that he had been partners in developing over 60 shopping centers and that Paynter Realty and Investments currently owned and operated seven shopping centers. Two of those shopping centers (Clovis and Visalia) leased space to Ross.

Grand Prospect's sole limited partner is John F. Marshall, who is a 50 percent owner. Marshall is a commercial real estate broker who received a college degree in business administration in 1974. Marshall started working in real estate in 1976, moved

4.

exclusively to commercial real estate in 1979, and started his own real estate company in 2001. His company specialized in selling and leasing shopping centers. Marshall met Paynter in 1983 when the both were working on a shopping center project in Turlock. Marshall was familiar with Ross, having acted as its broker in numerous lease transactions between 2002 and 2011.

*The Negotiations*

In 2005, a former grocery store building became available at the Porterville Marketplace and Marshall contacted Ross to see if Ross would be interested in the location. In October 2005, Marshall (acting as Grand Prospect's broker) showed Mike Seiler of Ross the site and several other locations in Porterville. Seiler worked with Marshall to prepare a letter of intent, which was similar to the one used for a store in a Clovis shopping center managed by Paynter. Seiler, not Marshall, was responsible for the letter's contents. After making changes, Seiler emailed the letter of intent to Marshall and directed him to forward it to Paynter.

The first version of the letter of intent presented to Paynter was dated October 20, 2005, set the initial term of the lease at 10 years with minimum rent for the first five years at $10.50 per square foot with an increase to $11.00 for the second five years. The letter of intent provided four five-year renewal options, each with a $0.50 increase in rent. The letter of intent also contained cotenancy provisions that required, at commencement and throughout the full term of the lease, 70 percent of the leasable floor area in the center be occupied by retail tenants, including Target and Mervyn's occupying 87,000 and 76,000 square feet, respectively.

The negotiations of the letter of intent were delayed when Paynter learned Target was considering moving out of the shopping center. Eventually, Target decided to stay in Porterville Marketplace and expand its store. As a result, Paynter delivered his revisions to the letter of intent to Ross in the spring of 2007.

5.

After further negotiations, the final letter of intent, dated July 11, 2007, was signed by the parties. The minimum rent was $13.25 for the first 10 years and $14.00 for the first option period with $0.50 increases for each of the three remaining option periods. The calculation of the 70 percent occupancy requirement stated that it would exclude Ross "and Target as to the Commencement Date to be further negotiated in the lease, from the numerator and denominator …." Target was required to occupy 126,000 square feet on the commencement date and during the term of the lease; Mervyn's 76,000 square feet.

With the nonbinding letter of intent in place, the parties began negotiating the lease for 30,316 square feet of space in the Porterville Marketplace.

On April 4, 2008, the lease for a Ross store at Porterville Marketplace was executed on behalf of Ross by James Fassio, executive vice president, and Gregg McGillis, group vice president of real estate (the Lease). Four days later, Paynter signed the Lease on behalf of Grand Prospect.

The terms of the Lease's cotenancy provisions required Mervyn's to be operating its business in 76,000 square feet on the commencement date of the Lease.[2] Other aspects of the cotenancy provisions are described in part I.B, *post*.

*Actions Under the Lease*

In early July 2008, Grand Prospect notified Ross the construction work on the store had been completed and Ross, if it chose, could take delivery early.[3] Jack Toth, then Ross's director of real estate responsible for the San Joaquin Valley, responded with an email stating Ross intended to take delivery on February 9, 2009, as stated in the lease.

---

**2** Grand Prospect was not Mervyn's landlord because Mervyn's owned its building in the shopping center. Therefore, Grand Prospect had no control over whether Mervyn's continued to operate in the shopping center. After Mervyn's closed its store, Grand Prospect purchased the building and subsequently leased most of the space to Kohl's Department Stores.

**3** The construction of the Ross tenant improvements cost Grand Prospect more than $2.3 million.

In late July 2008, Mervyn's filed for reorganization under federal bankruptcy law. In October 2008, the bankruptcy case was converted to a liquidation under chapter 7 of the Bankruptcy Code. The Mervyn's store in the Porterville Marketplace closed on December 31, 2008.

In October 2008, Paynter became aware that Mervyn's was going to close its stores and, as a result, Grand Prospect could not meet the opening cotenancy requirement in Lease. Paynter contacted Toth and told him about Mervyn's liquidation. On October 24, 2008, Toth sent Paynter an email asserting: "We negotiated hard for the Mervyn's co-tenancy because it makes a huge difference to us financially. Without Mervyn's, we will open very soft and it will take much longer for Ross to get established in Porterville." Toth made two proposals for amending the Lease. Under the first, Ross would pay two percent of sales as rent and, once a suitable replacement tenant was found, would go back to full rent. Under the second proposal, the requirement for Mervyn's as a cotenant would be eliminated and Ross would pay a fixed rent of $10.00 per square foot for the initial term (versus $13.25).

The parties were unable to negotiate a modification of the Lease. On February 6, 2009, Ross advised Grand Prospect that it accepted delivery of the store as the Lease required, "subject to all its rights under the Lease, including the Required Co-Tenancy provisions of Section 6.1.3." The February 9, 2009, delivery date meant that the commencement date of the Lease was May 10, 2009.[4]

On May 10, 2009, neither Mervyn's nor a replacement anchor tenant was open for business in the Porterville Marketplace. Relying on the cotenancy provisions in the Lease, Ross opted not open a store or pay rent.

In January 2010, Grand Prospect notified Ross that it had entered into a lease with Kohl's Department Stores to occupy 24,000 square feet of the Mervyn's 76,000 square

---

[4]    The Lease defined the commencement date as 90 days following the delivery date.

feet space.  Ross regarded Kohl's as an acceptable replacement for Mervyn's, but concluded the lease between Grand Prospect and Kohl's did not cure the cotenancy failure because (1) Kohl's had not leased the required 76,000 square feet and (2) Kohl's was not scheduled to open within the 12-month cure period.

On January 21, 2010, Ross advised Grand Prospect that it would terminate the Lease 30 days after the expiration of the 12-month period.

In May 2010, one year after the commencement date, Ross provided Grand Prospect with formal notice that it was terminating the Lease because the reduced occupancy had remained in effect for 12 consecutive months.

Grand Prospect leased the Ross space to Famous Footwear (6,000 square feet) and Marshalls of California, LLC (24,316 square feet) in 2011.  These businesses opened and began paying rent in July and March of 2012, respectively.  These leases also contained cotenancy requirements.

## PROCEEDINGS

In April 2010, before Ross terminated the Lease, Grand Prospect filed a complaint against Ross for declaratory relief, breach of contract and unjust enrichment.   Grand Prospect requested (1) a judicial declaration that the cotenancy provisions were unenforceable and (2) money damages for unpaid rent, future rent and expenditures on tenant improvements.

In June 2010, Ross filed a cross-complaint against Grand Prospect, seeking a judicial declaration of the parties' rights and duties under the Lease.

In November 2012, a jury trial began.  On the 13th day of the jury trial, December 17, 2012, the trial court issued an oral ruling on the issues that had been reserved for the court.  It determined the cotenancy provisions were unconscionable and were an unenforceable penalty and struck those provisions from the lease.  By striking the cotenancy provisions from the lease, the court found that Ross had breached the lease by

8.

failing to pay rent and terminating the lease. The court rejected Grand Prospect's cause of action for unjust enrichment.

The jury was then instructed on two issues related to damages. First, the jury was directed to determine the amount that would reasonably compensate Grand Prospect for Ross's failure to pay rent and its termination of the lease. Second, the jury was directed to determine the amount of damages, if any, Grand Prospect could have avoided with reasonable efforts and expenditures.

The special verdict form submitted to the jury required findings as to four items of damages. The first item addressed the worth of the unpaid rent that had been earned at the time of termination. The jury found this amount was $672,100. The jury's findings on the three other damage items, relating to the termination of the Lease, brought Grand Prospect's total damages to $3,785,714.86.

After the trial court decided Grand Prospect's contested motion for attorney fees and denied Ross's motion for a new trial, it entered an amended judgment of $4,701,990.83 in favor of Grand Prospect, which included an award of approximately $916,275 in attorney fees and costs.

Ross timely appealed.

## DISCUSSION

I.  COTENANCY PROVISIONS

A.  Overview

Cotenancy requirements are included in retail leases for the benefit of the tenant. They generally require other stores in the shopping center to be occupied by operating businesses. (1 *Retail Leasing*, *supra*, § 7.1, p. 7-2.) Their purpose is to assure the tenant that "(1) there is a critical mass of key tenants or occupants as well as a sufficient population of other retailers that have opened for business or will concurrently open when the tenant is required or intends to open, and (2) there is a satisfactory level of occupancy by these tenants or occupants during the term of the lease after the tenant has

9.

opened." (1 *Retail Leasing*, *supra*, § 7.2, p. 7-2.) Cotenancy provisions usually are found only in retail leases. (*Ibid.*)

Cotenancy provisions can be categorized as *opening* cotenancy requirements and *operating* cotenancy requirements. (1 *Retail Leasing*, *supra*, § 7.4, p. 7-4.) "Opening cotenancy requirements condition the tenant's obligation to open for business or commence paying minimum rent on satisfaction of the cotenancy requirement." (*Ibid.*) "Operating cotenancy requirements condition the tenant's obligation to either continue to conduct business or to continue to pay minimum rent on the active operation of certain named tenants and/or a predetermined level of occupancy within the shopping center." (*Ibid.*)

The major points covered by cotenancy provisions are (1) the specific named cotenants and level of occupancy required, (2) any right the landlord has to cure failures to meet a cotenancy requirement, and (3) the tenant's remedies if a cotenancy failure occurs. (1 *Retail Leasing, supra,* at § 7.1, p. 7-2.) These three major points can be resolved by the landlord and tenant in many different ways. Consequently, there is no standard form of cotenancy requirements. (See *id.* at §§ 7.27-7.29, pp. 7-17 to 7-25 [two forms of opening cotenancy requirements, with three alternatives in the second form]; 2 Miller & Starr, Cal. Real Estate Forms (2d ed. 2005) § 2:21, pp. 512-563 [cotenancy requirements addressed in section 2.2 of sample retail lease for space in large shopping center under construction].)

Variation in cotenancy requirements may occur because a particular tenant's business concerns about other tenants might be more complex than simply avoiding vacancies. For instance, a national greeting card chain might be more concerned that the center's supermarket continues in business than the center's other stores because it has ascertained its stores perform better in shopping centers anchored by a supermarket. (1 *Retail Leasing*, *supra*, § 7.2, p. 7-3.) As to the tenant's remedies on the failure of the *opening* cotenancy requirement, they might include (1) the right to delay the opening of

10.

the tenant's store, (2) payment of alternative rent, (3) termination of the lease, or (4) a combination of these remedies. (*Id.* at §§ 7.13-7.15, pp. 7-10 to 7-11.) Further variation can occur if a landlord seeks to impose conditions on the tenant's exercise of these remedies. (*Id.* at § 7.20, p. 7-14.) Conditions may include the absence of a tenant default in the lease and, in the case of rent abatement, the tenant's continued operation of its business on the premises. (*Ibid.*) Finally, how these various points are resolved during the negotiation of a commercial lease "varies greatly depending on the relative bargaining strengths of the landlord and the tenant." (*Id.* at § 7.3, p. 7-3.)

The variation in cotenancy requirements, and the remedies given to a tenant when the requirements are not met, prevents the application of a categorical rule of law regarding enforceability. For instance, there is no general principle of California law holding cotenancy provisions in a commercial retail lease can never be unconscionable. Similarly, there is no categorical rule holding cotenancy provisions are unreasonable per se and therefore unenforceable penalties. Instead, the validity of a cotenancy provision depends upon the facts and circumstances proven in a particular case.

  B. <u>Cotenancy Requirements in the Lease</u>

The cotenancy requirements in the Lease are set forth in sections 1.7.1, 1.7.2 and 6.1.3. The provisions relevant to this appeal concern Mervyn's absence from the shopping center on the commencement date and the continuation of this vacancy for 12 months. As a result of these events, Ross paid no rent and, as soon as allowed, exercised an option to terminate the Lease.

  *1. Commencement Date Cotenancy Requirements*

Section 1.7.1 of the Lease required Mervyn's and Target to occupy no less than 76,000 and 126,000 square feet of leasable floor area, respectively, on Ross's

11.

commencement date. In addition, section 1.7.2 required 70 percent of the leasable floor area to the shopping center to be occupied by operating retailers.[5]

## 2. *Commencement Date Reduced Occupancy Period*

Section 6.1.3(b) of the Lease defined a "Commencement Date Reduced Occupancy Period" as beginning with the failure of one of the required tenants to be open for business on the commencement date of the Lease and continuing until cured. Because Mervyn's had closed its store, a "Commencement Date Reduced Occupancy Period" began. As a result, section 6.1.3(b) provided that Ross was not required to open its store for business. That section also stated that, "regardless of whether [Ross] opens for business in the Store, no Rent shall be due or payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured." For purposes of this opinion, this term of the Lease is referred to as the "rent abatement provision".[6]

---

[5] Section 1.7.1 of the Lease also included the following operating condition: "Provided that the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 is satisfied on the Commencement Date, during the remainder of the Term, the Required Co-Tenant shall be either Mervyn's or Target occupying no less than the Required Leasable Floor Area indicated in (a) and (b) above. The Required Co-Tenant may be replaced by a nationally or regionally recognized Anchor Tenant (as herein defined) reasonably acceptable to Tenant, operating in no less than the Required Leasable Floor Area of the Required Co-Tenant being replaced. An 'Anchor Tenant' is a national retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75) stores occupying no less than the Required Leasable Floor Area of the Required Co-Tenant being replaced." !(4-AA-846)

[6] The rent abatement provision might have allowed Ross free rent for the 10-year initial term of the Lease and perhaps during the optional renewal periods, so long as the vacancy of Mervyn's space was not cured with a replacement anchor tenant.

However, the "Commencement Date Reduced Occupancy Period" clearly was curable, even though the Lease's requirement that Mervyn's and Target be operating *on the commencement date* could not be satisfied by a substitute tenant operating in the same space on the commencement date. The commencement date requirement focused solely on commencement date operations by Mervyn's and Target and was significant because, if satisfied, for the remainder of the Lease the required cotenant could be *either* Mervyn's or Target. In contrast to the commencement date requirement, the provision regarding Commencement Date Reduced Occupancy Period involved an examination of

12.

Section 6.1.3(b) also provided Ross with an option to terminate the Lease conditioned upon (1) the Commencement Date Reduced Occupancy Period continuing for 12 months and (2) Ross giving 30 days' notice of termination prior to the expiration of the Commencement Date Reduced Occupancy Period. Section 6.1.3(b)'s reference to 12 months did not limit the free rent to the first 12 months of the Lease and did not limit the cure period to those months. Rather, the 12-month period identifies when Ross accrued an option to terminate the Lease.

## II.    UNCONSCIONABILITY

### A.    Fundamental Principles

Unconscionability is a defense to the enforcement of an entire contract or particular contractual provisions. (Civ. Code, § 1670.5, subd. (a).) "Unconscionability" does not have a precise legal definition, but has been described as extreme unfairness. (Black's Law Dictionary (9th ed. 2009.) p. 1663; see *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 487 [no precise definition of substantive unconscionability can be proffered] (*A & M Produce*).)

The unconscionability defense to the enforcement of a contract was codified in Civil Code section 1670.5 in 1979. (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1398; see Stats. 1979, ch. 819, § 3.) The statute did not create new law, but simply codified the existing common law. (*Beasley v. Wells Fargo Bank*, *supra*, at p. 1398.) Civil Code section 1670.5 provides in full:

> "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the

---

circumstances existing after the commencement date. For instance, if the type of national or regional retailer described in section 1.7.1 of the Lease began operating in Mervyn's space on or before the commencement date, there would have been no Commencement Date Reduced Occupancy *Period*.

13.

application of any unconscionable clause as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."[7]

Some of the common law principles of unconscionability were set forth by Judge J. Skelly Wright in his often-cited formulation of the doctrine:

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (*Williams v. Walker-Thomas Furniture Co.* (D.C.Cir. 1965) 350 F.2d 445, 449.)

The first California court to quote this formulation was the Fourth Appellate District. (*A & M Produce*, *supra*, 135 Cal.App.3d at p. 486.) Judge Wright's formulation has been repeated by our Supreme Court and the Ninth Circuit of the United States Court of Appeal. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1133, 1145, 1159; *Ingle v. Circuit City Stores, Inc.* (9th Cir. 2003) 328 F.3d 1165, 1170 [arbitration agreement signed by employee as part of job application was unconscionable under California contract law].) The formulation contains both a procedural and a substantive element. (*Pinnacle Museum Toward Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*); Leff, *Unconscionability and the Code—the Emperor's New Clause* (1967) 115 U. Pa. L.Rev. 485 [seminal article discussing procedural and substantive elements of unconscionability].)

---

**7**     Civil Code section 1670.5 was adopted verbatim from section 2-302 of the Uniform Commercial Code, but expanded its coverage to include all contracts, not just those for the sale of goods. (*Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 81.)

The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression and surprise[8] due to unequal bargaining power. (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)

In contrast, the substantive element is concerned with the fairness of the agreement's actual terms and assesses whether they are overly harsh or one-sided. (*Pinnacle, supra,* 55 Cal.4th at p. 246.)  Thus, substantive unconscionability is described by the phrases "'"unduly oppressive,"'" "'"so one-sided as to 'shock the conscience,'"'" and "'unreasonably favorable to the more powerful party.'"  (*Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1145.)

### 1. Burden and Sliding Scale

The party challenging the validity of a contract or a contractual provision bears the burden of proving unconscionability.  (*Pinnacle*, *supra*, 55 Cal.4th at p. 247.)  California is among the jurisdictions requiring both elements be shown.  (*Ibid*.; cf. *Maxwell v. Fidelity Financial Services, Inc.* (1995) 184 Ariz. 82, 90 [907 P.2d 51, 59] [unconscionability can be established by a showing of substantive unconscionability alone].)  The evidence presented must show the circumstances that existed at the time the contract was made because the determination of unconscionability is not based on hindsight in light of subsequent events.  (Civ. Code, § 1670.5, subd. (a); *Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1164.)

The elements of procedural and substantive unconscionability need not be present to the same degree because they are evaluated on a sliding scale.  (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)  Consequently, the more substantively oppressive the contract term, the less evidence of

---

**8**    This case does not involve surprise and, therefore, that aspect of procedural unconscionability is not discussed further.  (See *McCaffery Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1349 (*McCaffery*) [surprise typically involves a provision hidden within the prolixity of a preprinted form contract].)

15.

procedural unconscionability is required to conclude the term is unenforceable, and vice versa. (*Ibid.*)

## 2. *Procedural Unconscionability*

The oppression that creates procedural unconscionability arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice. (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 808; see *Pinnacle, supra*, 55 Cal.4th at p. 247.)

In general, California law allows oppression to be established in two ways. First, and most frequently, oppression may be established by showing the contract is one of adhesion. (*McCaffrey*, *supra*, 224 Cal.App.4th at p. 1349 [oppression generally entails a contract of adhesion]; see *Pinnacle*, *supra*, 55 Cal.4th at p. 246 [procedural unconscionability generally takes the form of a contract of adhesion].)[9] The principles that define a "contract of adhesion" are discussed and applied in part II.C. of the Discussion, *post*.

In the absence of an adhesion contract, the oppression aspect of procedural unconscionability can be established by the totality of the circumstances surrounding the negotiation and formation of the contract. (*Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1125.) The circumstances relevant to establishing oppression include, but are not limited to: (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure[10] exerted on the party to sign the proposed

---

[9] We recognize that showing a contract is one of adhesion does not always establish procedural unconscionability. (See *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1470, fn. 2 [in some situations, the oppression typically inherent in adhesion contacts is minimal].)

[10] Pressure can come from a stronger party using high-pressure tactics, coercion or threats short of duress. (See *Lovey v. Regence BlueShield of Idaho* (2003) 139 Idaho 37, 42 [72 P.3d 877, 882].) Pressure also can be generated by surrounding circumstances such as market conditions and factors affecting timing. (*Ibid.*; see Comment, *The Philosophical Dimensions of the Doctrine of Unconscionability* (2003) 70 U. Chi. L.Rev.

contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney. (See *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 796; DiMatteo & Rich, *A Consent Theory of Unconscionability: An Empirical Study of Law in Action* (2006) 33 Fla. St. U. L.Rev. 1067, 1077 [the merchant-consumer distinction described as a meta-factor in unconscionability cases as relatively few merchant unconscionability claims are upheld; presence of an attorney in precontract negotiations diminishes the likelihood a contract will be held unconscionable].)

In Ohio, another jurisdiction that examines both procedural and substantive unconscionability, an appellate court stated: "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, e.g., 'age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.'" (*Collins v. Click Camera and Video, Inc.* (1993) 86 Ohio App.3d 826, 834[ 621 N.E.2d 1294, 1299].)

To summarize, courts evaluating procedural unconscionability must consider the totality of the circumstances surrounding the negotiation and formation of the contract, giving particular consideration to factors that affect the presence of oppression or the absence of a meaningful choice.

### 3. Substantive Unconscionability

Substantive unconscionability is not susceptible to precise definition. (*Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1163.) It appears the various descriptions—unduly oppressive, overly harsh, so one-sided as to shock the conscience,

1513, 1514 [urging unconscionability be "defined solely by reference to external factors that may prevent parties from making free choices"].)

17.

and unreasonably favorable to the more powerful party—all reflect the same standard. (*Id.* at pp. 1145, 1159.)  Substantive unconscionability is not concerned with a simple old-fashioned bad bargain.  (*Ibid*.)

"Factors courts have considered in evaluating whether a contract is substantively unconscionable include the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability." (*Hayes v. Oakridge Home* (2009) 122 Ohio St.3d 63, 69 [908 N.E.2d 408, 414].)

B. Standard of Review

The legal principles that define the doctrine of unconscionability demonstrate that numerous factors are relevant to determining whether a contract or a particular provision is unconscionable.  Despite the numerous factual issues that may bear on the question, unconscionability is ultimately a question of law for the court.  (*McCaffrey*, *supra*, 224 Cal.App.4th at p. 1347.)  Where the trial court's determination of unconscionability turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's determination and review the trial court's factual findings under the substantial evidence standard.  (*Ibid*.)  When some facts of a case are determined under the foregoing rule and other facts are undisputed because there are no material conflicts in the evidence, appellate courts conduct a de novo review of those facts and makes its own unconscionability determination.  (*Ibid*.)

Our application of the de novo standard of review is illustrated by *Crippen v. Central Valley RV Outlet, Inc.* (2004) 124 Cal.App.4th 1159, a case in which we (1) concluded the plaintiff had failed to prove procedural unconscionability and (2) reversed the trial court's determination that the arbitration agreement in question was unenforceable.

C.     Contract of Adhesion

   1.     *The Lease as a Whole*

Grand Prospect contends the Lease was a contract of adhesion.  Ross argues that its unwillingness to sign a lease without the protection of cotenancy clauses cannot transform a heavily negotiated lease between sophisticated parties into a contract of adhesion.  Ross also contends there is no case law supporting the position that procedural unconscionability exists merely because a party viewed one of many points under discussion as critical to reaching a deal, while willingly negotiating numerous other material terms, including price.

The California Supreme Court has defined the term "contract of adhesion" to mean (1) a standardized contract[11] (2) imposed and drafted by the party of superior bargaining strength (3) that provides the subscribing party only the opportunity to adhere to the contract or reject it.  (*Armendariz*, *supra*, 24 Cal.4th at p. 113; *Von Nothdurft v. Steck* (2014) 227 Cal.App.4th 524, 535.)

We conclude the undisputed facts of this case establish the lease was not a contract of adhesion.  First, it was not a standardized, preprinted form.  (See *Von Nothdurft v. Steck*, *supra*, 227 Cal.App.4th at p. 536 [management agreement "was not a preprinted form contract"].)

Second, and more importantly, Grand Prospect was given the opportunity to negotiate the terms of the lease.  To reach an agreement acceptable to both sides, the parties went through multiple drafts of a letter of intent and five versions of the Lease.  Furthermore, the Lease was based on the earlier Clovis lease, which was the product of

---

**11**     We note that California Supreme Court decisions more recent than *Armendariz* have not included the "standardized contract" element in their description of an adhesion contract.  (See *Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 57 Cal.4th at p. 1133; *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071.)  Thus, it is possible to have a contract of adhesion when a contract is used in one transaction—that is, is not standardized for use in multiple transactions.

negotiations between Paynter and Ross's attorney Theani Louskos. She also represented Ross in finalizing the Grand Prospect Lease. The facts establish that Grand Prospect's choices were not limited to rejecting or adhering to the draft of the Lease first presented by Ross.

Therefore, the Lease itself does not fit the definition of a contract of adhesion.

### 2. Clause of Adhesion

A question presented by the facts of this case is whether the Lease should be classified as a contract of adhesion because the cotenancy requirements were presented by Ross on a take-it-or-leave-it basis. We conclude this aspect of Ross's negotiating posture did not make the Lease a contract of adhesion.

In *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, the court used language that suggests a *clause* might qualify as a contract of adhesion when it stated, "even if the clause at issue here is not an adhesion contract, it can still be found unconscionable." (*Id.* at p. 1100.) In *Szetela*, a credit card company inserted a notice in its customer's billing statement that stated the cardmember agreement was being amended to include an arbitration clause. (*Id.* at p. 1096.) If the customer did not wish to accept the terms of the amendment, the only option was to notify the credit card company, which would then close the account. (*Id.* at p. 1097.) When the customer challenged the arbitration clause as unconscionable, the court analyzed the process by which that clause was added to the contract, not the formation of the original contract. The court stated:

> "Procedural unconscionability focuses on the manner in which the disputed clause is presented to the party in the weaker bargaining position. When the weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present. [Citation.] These are precisely the facts in the case before us. Szetela received the amendment to the Cardholder Agreement in a bill stuffer, and under the language of the amendment, he was told to 'take it or leave it.' His only option, if he did not wish to accept the amendment, was to close his account. We agree with Szetela that the oppressive nature in which the amendment was imposed

20.

establishes the necessary element of procedural unconscionability." (*Id*. at p. 1100.)

*Szetela* does not establish that the inclusion of a take-it-or-leave-it clause in an agreement makes the entire contract one of adhesion. Instead, it establishes that when a clause *is added to a contract by an amendment*, the inquiry into procedural unconscionability is concerned with the circumstance surrounding the negotiation and formation of the amendment, not the original contract. Where the amendment contains a single clause, that clause or the amendment can be described accurately as a contract of adhesion. It does not follow, however, that the inclusion of a take-it-or-leave-it clause in a negotiated agreement turns the entire agreement into a contract of adhesion.

In summary, we do not interpret *Szetela* to mean that when the relatively stronger party insists on including a particular provision in a contract, the entire contract becomes a contract of adhesion. Therefore, the Lease was not a contract of adhesion by virtue of Ross insisting that it contain cotenancy provisions.

D.      General Circumstances Relevant to Procedural Unconscionability

1.      *Sophistication*

The circumstances relevant to procedural unconscionability include age, education, intelligence, business acumen and experience. Paynter received a bachelor's degree in business administration. At the time of trial, he had over 33 years of experience in real estate. In 1988, Paynter and an attorney left a development company and formed their own company to develop shopping centers. In 1998, the attorney returned to the practice of law and Paynter formed his current company, Paynter Realty and Investments, which is based in Tustin. Paynter Realty and Investments is involved in both development of shopping centers and managing those properties. Its management fee is typically three to four percent of the rent collected. Paynter testified that he had been partners in developing over 60 shopping centers and that Paynter Realty and Investments currently owned and operated seven shopping centers. Paynter's limited partner, John

21.

Marshall, was equally experienced, and had earlier acted as Ross's broker in numerous lease transactions.

Paynter's age, education, intelligence, business acumen and experience are not among the factors that support a finding of procedural unconscionability. The record shows Paynter was college-educated, very experienced in developing and managing shopping centers, and successful in that business. In short, Paynter was sophisticated and these factors did not place him at a disadvantage in bargaining with Ross.

Paynter's sophistication means that his decision not to seek the advice of an attorney to assist him in the negotiations with the attorney representing Ross was not significant. From earlier business dealings with Ross, Paynter and Marshall were familiar with the terms Ross wanted in the lease and they understood the cotenancy terms without an explanation of those terms from a lawyer.

### 2. *Time Pressure*

The trial court did not find, and it does not appear from the evidence in the record, that Ross exerted time pressure on Paynter and, as a result, prevented him from fully understanding how the cotenancy provisions would operate. Cotenancy provisions were in the first letter of intent presented by Marshall to Paynter in 2005 and the lease was not signed until April 2008. Ross did not impose deadlines during the negotiations for the purpose of pressuring Paynter into making a quick, ill-considered decision that would have been more favorable to Ross than it could have obtained without any time pressure. Therefore, time pressure is not a factor that supports a finding of procedural unconscionability.

### 3. *Economic Pressure*

The record does not contain evidence showing Grand Prospect was economically vulnerable and this vulnerability was exploited by Ross during the negotiations. For example, there is no evidence that Grand Prospect was having difficulty servicing its debt or that a balloon payment on a loan was coming due and, therefore, Grand Prospect was

willing to accept onerous terms in order to begin receiving rent from the space. The only economic pressure apparent in this case is the same pressure that every commercial landlord experiences when a space is vacant and not generating rent.

### 4. *Pressure from Coercion or Threats*

The record contains no evidence that Ross used coercion or threats while negotiating the Lease. For example, Ross did not threaten Paynter by saying that, if he did not agree to the Lease and its cotenancy requirements, breaches would be "found" in Ross's other leases with him and payment of rent under those leases would be stopped.

### 5. *Relative Bargaining Power*

Ross had an advantage in bargaining power because it was the larger company in terms of financial resources and personnel. Also, at the time the Lease was being negotiated, Ross was negotiating leases at many other locations. The fact that Ross was opening stores at other locations made the opening of a store in Porterville less important to Ross than it was to Grand Prospect.

The fact that Ross had more bargaining power than Grand Prospect does not mean that inequality in power resulted in no real negotiations and an absence of a meaningful choice for Grand Prospect. (See *Aron v. U-Haul Co. of California*, *supra*, 143 Cal.App.4th at p. 808.) Here, the parties negotiated before the letter of intent was signed and negotiated further before the Lease was signed. One of the points subject to further negotiation was the specific terms of the cotenancy requirements. Although Ross would not agree to a lease without cotenancy requirements, the terms for the tenant remedy and landlord cure were subject to negotiation, and Ross eventually agreed to a base monthly rent well above its original offer.

### 6. *Meaningful Choices*

The record shows that John Marshall of Grand Prospect, who had acted as Ross's broker in numerous earlier lease transactions, first approached Ross as a prospective tenant. The record also shows that Ross was Grand Prospect's first choice to fill the

23.

vacancy and that Paynter was familiar with the contents of the leases used by Ross, including its cotenancy provisions. There were other companies that Grand Prospect could have approached about the empty space. Thus, Paynter had a meaningful choice when he began to pursue Ross as a tenant. The fact that other companies would have required cotenancy provisions in any lease they signed with Grand Prospect does not mean the choice made by Paynter was not meaningful. The specifics of the cotenancy requirements vary and Paynter decided to pursue a company that would pay higher rent, rather that pursuing a company that would have accepted cotenancy provisions more favorable to Grand Prospect, at a lower rent.

### 7. Conclusion

Based on the foregoing factors, we conclude there were real negotiations between the parties and Paynter was given meaningful choices both in initiating contact with Ross and during the negotiations of the Lease. (See *Aron v. U-Haul Co. of California*, *supra*, 143 Cal.App.4th at p. 808.) The fact Ross insisted upon cotenancy provisions is not determinative because the specifics of those provisions were subject to negotiations. Therefore, we conclude there was no procedural unconscionability in this case and, thus, unconscionability does not provide a ground for invalidating the cotenancy provisions in the Lease. (See *Crippen v. Central Valley RV Outlet, Inc.*, *supra*, 124 Cal.App.4th 1159 [trial court reversed because plaintiff failed to prove arbitration agreement was procedurally unconscionable].)

## III. PENALTIES

### A. Standard of Review

Whether a contractual provision is an unenforceable penalty is determined by the trial court, not the jury. (*Beasley v. Wells Fargo Bank, supra,* 235 Cal.App.3d at p. 1393.) As a result, the issue has been described as a question of law. (*Ibid.*) However, the validity of a provision alleged to be an unlawful penalty "is not really a classic question of law, but is one of fact that, because of its character, is nevertheless committed

24.

to judicial determination." (*Id*. at p. 1394.) Thus, a trial court decides, in light of all the facts, including the whole instrument, whether the provision in question is an unlawful penalty. (*Ibid*.)

Despite the nature of the trial court's decision, some courts have stated the determination whether a provision constitutes an unlawful penalty is subject to de novo on appeal. (*Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 794.)

Based on the foregoing precedent, we conclude the ultimate question of a provision's invalidity as a penalty is a question of law subject to de novo review, but the factual foundation for appellate review consists of (1) the facts that are not in dispute and (2) the facts that are established by viewing the conflicting evidence in the light most favorable to the trial court's judgment. (See *A & M Produce, supra,* 135 Cal.App.3d at p. 489.)

### B. Conditional Provisions Sometimes Are Penalties

The first legal question raised by the parties' contentions is whether a contract provision triggered by one or more conditions precedent can be deemed a penalty under California law. We conclude conditional provisions sometimes can operate as penalties.

#### 1. General Principles

Ross's argument that a condition precedent is not a penalty is contrary to a treatise on contract law that devotes a chapter to the topic of *conditions* and promises that cause a forfeiture or penalty. (14 Williston on Contracts (4th ed. 2013) ch. 42, pp. 403-594.) When justice requires, a court "can excuse the performance of conditions and promises otherwise agreed to by the parties. The fact that a promise or condition, if not excused, will operate harshly or unfairly in a particular case does not in itself justify a court in excusing its performance, but the law has long strictly scrutinized—and often prohibited through the use of a principle inherently incapable of precise articulation or application—the enforcement of forfeitures or penalties even though the parties' agreement refers to

them as 'liquidated damages' or some other innocuous term." (14 Williston on Contracts, *supra*, § 42:1, pp. 404-407, fns. omitted.)

The treatise's reference to both conditions and promises indicates that, contrary to Ross's position, it is possible for a condition precedent to operate as a penalty. More explicitly, the treatise states: "A condition may be as penal in its effects as a promise to pay a penalty." (14 Williston on Contracts, *supra*, § 42:6, p. 444, fn. omitted.) The treatise also asserts that "relief against the effect of penalties should depend as little as possible on the form a transaction takes." (*Id*. at p. 445, fn. omitted.) In short, phrasing a forfeiture of payment in conditional language does not exempt it from judicial scrutiny.

### 2. *California's Approach to Conditions and Penalties*

We believe the treatise accurately described the law of California, which does not allow unreasonable penalties or forfeitures simply because they are imaginatively drafted as contractual conditions.

First, the Legislature has directed California courts to put substance before form. Civil Code section 3528 states: "The law respects form less than substance." Adhering to this fundamental principle, our Supreme Court has "consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures. [Citations.]" (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737 [charges assessed on late installment payments that were calculated as a percentage of the entire unpaid balance of the loan, not the amount of the overdue installment, were invalid penalties].) Pursuant to the substance-over-form principle, a court must determine a contract provision's true function and operation when evaluating its legality. (*McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512, 523 (*McGuire*).)

Second, a California appellate court has applied the substance-over-form principle to a contractual provision drafted as a condition. In *Fox Chicago R. Corp. v. Zukor's* (1942) 50 Cal.App.2d 129 (*Fox Chicago*), the landlord and lessee entered a series of

26.

lease amendments reducing the rent to below the previously agreed upon $4,100 per month. (*Id*. at p. 131.) As modified, the lease amendments included a clause providing that, in the event of a default, the lessee would be obligated to pay the entire unpaid portion of the $4,100 rent for each and every month the lessee had paid a smaller amount. (*Ibid*.) When the lessee breached the lease by removing certain fixtures from the premises without the landlord's consent, the landlord sued and demanded approximately $159,000 under the provision. (*Id*. at p. 133.) The lessee filed a demurrer, which the trial court sustained without leave to amend. (*Id*. at p. 130.) The appellate court affirmed on the ground the landlord's recovery of rent at the initial rate constituted a penalty. (*Id*. at p. 136.)

On appeal, the landlord argued the $159,000 was merely a debt payable upon the happening of a certain event. (*Fox Chicago*, *supra*, 50 Cal.App.2d at p. 134.) The court concluded there was no debt. Instead, the language of the lease modification and surrounding circumstance convinced the court the provision was a penalty. (*Ibid*.) "Where the language of a condition thus appears upon a fair construction to be a penalty, the obligation is thereby invalidated. Any provision by which money or property is to be forfeited without regard to the actual damage suffered calls for a penalty and is therefore void." (*Ibid*.)

The appellate court also addressed the fact the obligation to pay prior rent reductions was worded as a condition:

> "There is nothing in … the lease [provision] that might remove it from the category of a penalty. It is not necessary that a penalty be designated as such in specific terms before it may be so classified. A condition in a contract providing for the payment of money not earned is just as much a penalty as though it had been stipulated to penalize the promissor should he default in the performance of his promise. [Citation.] If the lease had contained a provision that the breach of any condition thereof should obligate him to pay to the lessor the sum of $159,000, there would be no question of its being properly classified as a penalty. But cloaked in the innocent verbiage of a condition requiring the lessee to pay $159,000 in the event he should fail to perform some covenant which is collateral to the

27.

main covenant, it is equally a penalty. [Citation.] A provision in a contract exacting the payment of moneys for the violation of a collateral agreement is opposed to public policy and is not bereft of its vice because it may appear in the form of a condition. [Citation.]" (*Fox Chicago*, *supra*, 50 Cal.App.2d at p. 134.)

The statements in *Fox Chicago* that a lease provision drafted as a condition might be classified as a penalty is consistent with decisions involving other types of contracts. For instance, in *Henck v. Lake Hemet Water Co.* (1937) 9 Cal.2d 136 (*Henck*), a water supply contract stated that timely payment for the yearly bill was a condition precedent of the right to receive water. The water company did not send a notice that the bill was due, the buyer did not pay on time, and the company declared the contract terminated and refused to reinstate it after the buyer tendered the amount due with interest. Our Supreme Court affirmed the trial court's reinstatement of the contract, stating: "If the breach of such a condition works a forfeiture, equity in a proper case may grant relief." (*Id.* at p. 142; see *Root v. American Equity Specialty Ins. Co.* (2005) 130 Cal.App.4th 926, 939-940 [nonoccurrence of conditions precedent in contracts excused when nonoccurrence works a forfeiture].

Notwithstanding the foregoing cases, California courts have recognized that some conditional provisions in a contract do not operate as a forfeiture or penalty. In *Blank v. Borden* (1974) 11 Cal.3d 963, the Supreme Court examined a real estate listing agreement that provided the broker would be paid the full six percent commission if the owner withdrew the listing. (*Id.* at p. 966.) The court acknowledged it must look to the substance rather than form in determining the true function and character of an arrangement challenged as a voidable penalty. (*Id.* at p. 970.) The court then stated the listing agreement in question presented the owner with a true option or alternative. Specifically, the owner could continue the listing or could change his mind about selling the property, terminate the exclusive listing agreement, and pay the sum specified in the contract. The court concluded the payment required upon termination was valid because it did not have "the invidious qualities characteristic of a penalty or forfeiture." (*Id.* at p.

970.)  In summary, a contract provision that provides a party with a true alternative performance—that is, an alternative that provides a rational choice between two reasonable possibilities—does not involve an unenforceable penalty.  (*Id*. at p. 971; see *Parsons v. Smilie* (1893) 97 Cal. 647 [land purchaser's decision not to satisfy a condition subsequent by operating a lumber yard on the property for five years was willful and therefore he did not qualify under Civ. Code, § 3275 for relief from forfeiting property back to seller].)

Here, the conditions contained in the Lease regarding Mervyn's and the occupancy of its space did not provide Grand Prospect with an alternative performance because, at the time the Lease was made, Grand Prospect did not own the space or have any opportunity to affect, much less control, Mervyn's decision to cease its operations.

### 3.    California's Test of Invalid Penalties

Under California law, the characteristic feature of a penalty is the lack of a proportional relationship between the forfeiture compelled and the damages or harm that might actually flow from the failure to perform a covenant or satisfy a condition. (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977.)  In other words, an unenforceable penalty "bears no reasonable relationship to the range of actual damages the parties could have anticipated would flow" from a breach of a covenant or a failure of a condition.  (*Greentree Financial Group, Inc. v. Executre Sports, Inc.* (2008) 163 Cal.App.4th 495, 497.)

Therefore, the general rule for whether a contractual condition is an unenforceable penalty requires the comparison of (1) the value of the money or property forfeited or transferred to the party protected by the condition to (2) the range of harm or damages anticipated to be caused that party by the failure of the condition.  If the forfeiture or transfer bears no reasonable relationship to the range of anticipated harm, the condition will be deemed an unenforceable penalty.

C.      Separate Conditions with Separate Consequences

The next legal question we address is whether the test for invalid penalties should be applied to section 6.1.3(b) as a whole or whether the rent abatement provision and termination provision should be analyzed separately. We conclude the provisions must be analyzed separately.

Ross's right to rent abatement is separate from its option to terminate because (1) the abatement of rent existed whether or not Ross subsequently exercised its option to terminate the Lease, (2) each right is triggered by different (albeit, partially overlapping) conditions, and (3) each provision resulted in different consequences to the landlord-tenant relationship between Grand Prospect and Ross. Pursuant to section 6.1.3(b) of the Lease, the right to rent abatement came into existence if there was a Commencement Date Reduced Occupancy Period and continued in effect until the reduced occupancy was cured. In contrast, the option to terminate arose if the Commencement Date Reduced Occupancy Period continued for 12 consecutive months and was exercised by Ross giving a termination notice before the reduced occupancy was cured.

Given the distinct features of the rent abatement and termination provisions, we conclude the validity of each provision must be determined separately.

IV.     RENT ABATEMENT

A.      Overview of Validity of Rent Abatement Provisions

There is no general rule of law that states all rent abatement provisions in a commercial lease are valid or invalid. As the following cases from other jurisdictions indicate, whether a particular rent abatement provision operates as an unreasonable penalty depends upon the specific facts and circumstances of the case.

1.      *Rent Abatement Provisions That Were Penalties*

In *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust* (2004) 156 Ohio App.3d 65 [804 N.E.2d 979] (*Mark-It Place*), a grocery store's lease included an exclusive use provision that required an abatement of rent while a violation was in effect.

(*Id*. at p. 1002.)  The landlord later leased space in the shopping center to Wal-Mart without including a provision prohibiting Wal-Mart from selling groceries and other foodstuffs listed in the grocery store's exclusive use provision.  (*Id*. at pp. 985-986.)  The trial court concluded the lease's rent abatement provision was a valid liquidated damages clause and not an unenforceable penalty.  (*Id*. at p. 987, fn. 4.)  The appellate court disagreed, noting that the Wal-Mart lease could run for 50 years and conceivably allow the tenant to remain in the shopping center without paying rent for that period.  (*Id*. at p. 1003.)  As a result, the court concluded the provision abating the rent was a draconian penalty prohibited by Ohio case law.  (*Ibid*.)

Consequently, *Mark-It Place* provides an example of a rent abatement provision that was deemed an unenforceable penalty.

In *Sunny Isle Shopping Center, Inc. v. Xtra Super Food Centers, Inc.* (D.V.I. 2002) 237 F.Supp.2d 606, a tenant operating a supermarket in a shopping center had a lease that stated the landlord would not permit another tenant to sell food for consumption off premises and a violation of the covenant would allow the tenant to withhold its rent.  (*Id*. at pp. 607-608.)  The landlord violated this provision by leasing space to Kmart Corporation, a company that offered groceries for sale.  (*Id*. at p. 608.)  The tenant began withholding rent and the landlord filed suit seeking a declaration that the provision was unenforceable.  (*Ibid*.)  The tenant moved for summary judgment on the landlord's claim that the rent-withholding provision was an unenforceable penalty.  (*Id*. at p. 612.)  The district court denied the motion because it was unclear from the evidence whether the tenant suffered any financial loss since Kmart's arrival or whether any such losses were attributable to Kmart's sale of food products.  The existence of these factual questions precluded the court from determining the rent-withholding provision was enforceable and granting the tenant summary judgment.  Accordingly, this case provides an example of a provision for the abatement of rent that *might* be deemed an unenforceable penalty.

31.

## 2. Rent Abatement Provisions That Were Not Penalties

Some challenges to a rent abatement provision in commercial leases have failed. The federal decisions include *Red Sage Ltd. P'ship v. DESPA Deutsche Sparkassen Immobilien-Anlage-Gasellschaft mbH* (D.C. Cir. 2001) 254 F.3d 1120 (rent abatement provision resulting from breach of exclusive use covenant was enforceable) and *N. Providence, LLC v. A & P* (S.D.N.Y. 2014) 510 B.R. 42 (forfeiture of rent during period landlord did not pay construction allowance was enforceable under New Jersey law).

Decisions from state appellate courts include *Majestic Cinema Holdings, LLC v. High Point Cinema* (2008) 191 N.C. App. 163 [662 S.E.2d 20] (reversed trial court's decision that lease provision requiring the landlord to open 15,000 square feet of adjacent retail space or forego rent from tenant was unenforceable penalty]) and *Bates Advertising USA, Inc. v. 498 Seventh , LLC* (2006) 7 N.Y.3d 115 [850 N.E.2d 1137, 1140] (enforceable rent abatement was keyed to the number of days of landlord's nonperformance and varied from a half day to a day depending upon the importance of the item of work not completed by landlord).

The foregoing cases demonstrate that there is no categorical rule of law holding rent abatement provisions are enforceable or unenforceable. Thus, it is possible to draft a rent abatement provision that is reasonably related to the anticipated harm likely to be suffered.

### B. Rent Abatement Provision Was a Penalty In This Case

Generally, a contractual provision is an unenforceable penalty if the value of the money or property forfeited or transferred to the party protected by the provision bears no reasonable relationship to[12] the range of harm anticipated to be caused to that party by the failure of the provision's requirements. (See pt. III.B.3, *ante*.)

---

[12] The phrase "bears no reasonable relationship to" is synonymous with "bears no rational relationship to" (*Sybron Corp. v. Clark Hosp. Supply Corp.* (1978) 76 Cal.App.3d 896, 903) and "without regard to" (*Ebbert v. Mercantile Trust Co. of California* (1931) 213 Cal. 496, 499; *Fox Chicago*, *supra*, 50 Cal.App.2d at p. 134).

The application of the legal test defining contractual penalties requires this court to identify (1) the value of property forfeited or transferred by Grand Prospect and (2) the anticipated harm or damages that Ross was likely to have experienced as a result of the failure of the conditions specified in the rent abatement provision. The reference to *anticipated* harm or damage indicates that courts examine the circumstances that existed at the time of the making of the contract when determining if the provision is enforceable.

### 1. *Value of Property Forfeited or Transferred*

Under the terms of the Lease, Grand Prospect (1) transferred to Ross the right to possession of the retail space and (2) lost the right to receive monthly rent. Regardless of whether the loss is conceptualized as the forfeiture of possession of real estate or rent, we conclude the value of the rights relinquished by Grand Prospect pursuant to the rent abatement provision can be quantified by the rental rate set forth in the Lease.

The Lease specified the minimum rent as $33,473.92 per month. The Lease also required Ross to pay a pro rata share of (1) the costs for maintaining and repairing the shopping center's common areas, (2) real property taxes and assessments, and (3) certain insurance premiums.

Ross's pro rata share of these items is reflected in the calculations of Stuart Harden, a certified public accountant retained by Grand Prospect as an expert witness. Harden calculated the amount of damages Grand Prospect experienced from May 10, 2009, to June 11, 2010, using Civil Code section 1951.2. Under this statute, when a tenant's breach of a lease causes a termination, a landlord may recover "[t]he worth at the time of award of the unpaid rent which had been earned at time of termination." (Civ. Code, § 1951.2, subd. (a)(1).) Harden calculated (1) the unpaid rent as $513,320 and (2) the accrued interest as $158,780, using an interest rate of 10 percent. Harden added these two figures together and concluded the damages for the 13-month period was $672,100.

The jury accepted Harden's calculations when it answered "$672,100" to a question in the special verdict form about "[t]he worth at the time of award of the unpaid rent which had been earned at the time of termination."

Based on the trial court's finding that the withheld rental payments for 13 months totaled $513,320 (which is consistent with the jury's finding as to damages), we conclude that the value of the property rights Grand Prospect relinquished pursuant to the rent abatement provision was approximately $39,500 per month.

### 2. *Trial Court's Findings as to the Harm Anticipated*

At page four of its statement of decision, the trial court explicitly found "Ross did not anticipate any damage, *i.e.*, lost sales or profits, if or because Mervyn's would not be open on the Commencement Date." The court also found "the presence of Mervyn's was not a condition material to Ross under the Lease .…" The court reiterated its findings about anticipated harm at page 16 of its statement of decision when it compared that harm to the value of the property forfeited by Grand Prospect:

> "[T]he withheld Rent of $513,320 for the 13 months Ross maintained possession of the Premises[] bears no reasonable relationship to the actual damages Ross anticipated it would have suffered *if it had opened its store* at the [Porterville] Marketplace even though Mervyn's was not open on the Commencement Date because Ross did not anticipate it would suffer any damages in such an event." (Italics added.)

Ross does not challenge these findings of fact by the trial court on the ground they are unsupported by substantial evidence. Such a challenge would have failed in light of the e-mails and trial testimony of the Ross executives (Toth, McGillis and Fassio) cited by the trial court. The executives testified that no study or analysis was done to determine the impact of Mervyn's traffic on Ross's potential sales or, alternatively, the impact of Mervyn's closure on Ross's potential sales. Furthermore, in October 2008 after the Ross executives learned of the Mervyn's closure, they held the view that the Porterville Marketplace remained a desirable location for a store. McGillis testified that

34.

he was unable to state, one way or the other, whether the closure of Mervyn's stores in shopping centers where Ross was present adversely effected Ross's sales.

### 3. Ross's Theory of Error as to Anticipated Harm

Ross contends the trial court's analysis is "deeply flawed" because the "court assumed—without analysis—that the relevant inquiry was whether Ross expected to sustain losses *if it opened and operated the store*, and paid rent, despite Mervyn's closure." Ross contends the legally relevant evaluation of the cotenancy provisions "should have recognized that Ross would be entitled to defer opening its store as a way of mitigating its damages if Mervyn's failure to operate its store were deemed a 'breach' by Grand Prospect."

Ross argues that, in the situation where Ross mitigated its damages by not opening a store, the parties anticipated that the failure of the opening cotenancy requirement would have damaged Ross in the sum of (1) the $38,000 rent and common area charges it would have paid during the 12-month period, (2) all of the costs Ross would have incurred in building out and preparing to open the store, (3) unavoidable costs of maintaining the premises during that period, and (4) the loss of profits Ross expected to earn from operating the store with both Mervyn's and Target open for business in the shopping center.

We conclude Ross's arguments have failed to identify a legal error in the trial court's analysis of the anticipated harm the cotenancy provisions purportedly addressed.

First, Ross has not shown it objected to the trial court's statement of decision on the ground it omitted the relevant legal analysis.

Second, Ross has cited no legal authority to support its position that an inquiry into anticipated harm is limited to whether the tenant expected to sustain losses if it did *not* open and operate the store. Ross's position about the relevant inquiry is not consistent with the applicable legal standard. Under that standard, a court evaluating a contractual provision that might be a penalty must consider *the range of harm or*

35.

*damages anticipated* to be caused to that party by the failure to meet the contractual requirement by evaluating the circumstances existing at the time the contract was made. In considering this range, a court may not focus on a single scenario to the exclusion of others, which is what Ross argues the trial court should have done. Consequently, Ross's argument about the relevant inquiry fails to identify trial court error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant has the burden of affirmatively demonstrating prejudicial error].)

Third, the trial court's findings about anticipated harm support an implied finding regarding the causation of the purported harm described by Ross. Specifically, if the parties anticipated that Ross would have no damages if it opened and operated the store, then it logically follows that any lost profits resulting from Ross's decision not to open the store would not flow from (i.e., been caused by) Mervyn's absence. Instead, the loss of profits would be caused by Ross's own decision not to open the store—that is, the losses would have been self-inflicted.

Fourth, Ross appears to assert that, when it decided not to open the store, it was motivated by the desire to mitigate its damages. Under the well-established principles of appellate practice, we cannot accept (1) the factual assertion as to Ross's motivation or (2) the assertion that Ross, in fact, mitigated any damages by deciding not to open a store. The trial court made no such findings on these specific points and this court may not presume the existence of these purported facts. The judgment of the trial court is presumed correct and all intendments and presumptions are indulged to support that judgment. (*Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.) Under this principle and the doctrine of implied findings, an appellant such as Ross is not entitled to presume the existence of facts that support its claim of error unless the existence of that fact is the only reasonable deduction to be drawn from the evidence. Viewing the evidence in the light most favorable to the judgment, we must conclude Ross's decision was not motivated by the desire to mitigate its damages, but was part of a failed strategy to

36.

renegotiate the rent and achieve greater profits from a store at that location. Similarly, we must conclude that Ross caused, rather than mitigated, any damages it might have experienced because it was not operating a store at the Porterville Marketplace.

In summary, Ross has failed to demonstrate the trial court erred in its analysis of the damages or harm anticipated to flow from the failure of the conditions in the rent abatement provision.

### 4. *Comparison of Anticipated Harm to Value Forfeited*

The trial court's finding that there was no anticipated damage expected to flow from the Mervyn's vacancy makes the final step of the penalty analysis—the comparison of anticipated harm to the value of the property forfeited—relatively simple.

The value of the property forfeited by Grand Prospect was approximately $39,500 per month. As found by the trial court, no harm was anticipated to result from the Mervyn's vacancy. Therefore, we agree with the trial court's determination that there was no reasonable relationship between the value of the property forfeited by Grand Prospect ($39,500 per month) and the anticipated harm to Ross ($0 per month). Accordingly, the trial court correctly concluded the rent abatement provision was an unenforceable penalty.

### 5. *Civil Code Section 3275*

In reaching its conclusion that the rent abatement provision was an unenforceable penalty, the trial court referred to Civil Code section 3275, which provides:

> "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." )!

The trial court addressed the requirement for making full compensation to the other party by finding Ross's compensation would be the cost of installing and removing its signs. The court stated Ross did not offer evidence and no evidence was admitted as

to these costs. As a result, the court did not require Grand Prospect to compensate Ross for these costs.

Ross argues Civil Code section 3275 is not applicable to the facts of this case because the cotenancy provisions were conditions, not an "obligation" as that term is used in the statute. (See *Parsons v. Smilie, supra,* 97 Cal. at p. 654 [question noted but not decided].) We reject Ross's proposed interpretation of the statute. (See *Root v. American Equity Specialty Ins. Co.*, *supra*, 130 Cal.App.4th at pp. 939-940.) Instead, we conclude contracts are a type of "obligation" covered by Civil Code section 3275. (See Civ. Code, § 1428 [obligations are created by contract or operation of law].) Therefore, the phrase "the terms of an obligation" includes the terms of a contract, even when those terms are drafted as conditions precedent. (See Civ. Code, §§ 1434 [conditional obligation defined], 1436 [condition precedent defined].) Consequently, if a conditional provision in a provision constitutes an illegal penalty, then the affected party "incurs a forfeiture" for purposes of Civil Code section 3275 and "may be relieved therefrom." (Civ. Code, § 3275.)

Therefore, the trial court did not err when it applied Civil Code section 3275 to the rent abatement provision in the Lease.

V.     TERMINATION PROVISION

Section 6.1.3(b) of the Lease provided Ross with an ongoing option to terminate the Lease upon 30 days' notice if the Commencement Date Reduced Occupancy Period continued for 12 consecutive months and Ross's termination notice was given before the reduced occupancy was cured. Our analysis of whether the termination provision operated as a forfeiture begins with the rules that govern the termination of a commercial lease. If a forfeiture occurred, then we will subject the termination provision to scrutiny under the general rule that requires a reasonable relationship between the value of the property forfeited and the anticipated harm.

A.     Rule of Law Applicable to a Commercial Lease Termination Provision

California courts have developed a specific rule that applies to termination provisions in commercial leases.  The rule was stated by the California Supreme Court in *C. M. Staub Shoe Co. v. Byrne* (1915) 169 Cal. 122 (*Staub Shoe*), which involved a commercial lease with a provision stating the lease shall cease and become null and void if the premises were damaged by fire and the damage was so severe that it could not be repaired within 60 days.  (*Id*. at pp. 126-127.)  After a fire occurred, the tenant wanted to remain in possession and claimed the repairs could be completed within 60 days.  The landlord disagreed and seized the property.  The tenant filed an action for damages resulting from its exclusion from the property.  (*Id*. at p. 124.)  After a bench trial, a judgment was entered in favor of the landlord.  (*Id*. at p. 125.)  Our Supreme Court upheld the judgment for the landlord, stating "the ... clause makes entirely reasonable provision for the various contingencies that might result in case of fire or other injury to the building or premises.  There is here no basis for applying the rule of strict interpretation against conditions involving forfeiture.  (Civ. Code, sec. 1442.)  The clause terminating the lease in certain contingencies does not declare a forfeiture.  It fixes events, having no relation to any act or default of the parties, upon which it is agreed that the lease shall end."  (*Id*. at p. 129; *Caswell v. Gardner* (1936) 12 Cal.App.2d 597, 600 [contingent termination provision in lease did not result in a forfeiture]; see 7 Miller & Starr, Cal. Real Estate (3d ed. 2011) Landlord and Tenant, § 19:186, pp. 578-579 [exercise of an option to terminate lease].)

Similarly, in *11382 Beach Partnership v. Libaw* (1999) 70 Cal.App.4th 212, a landlord and a tenant entered into a commercial lease that stated either party could cancel the lease if a fire destroyed the premises within two years before the termination of the lease expired.  (*Id*. at p. 215.)  After a fire, the tenant exercised a five-year option under the lease.  The landlord canceled the lease, returned the tenant's latest rent check and threatened legal action to recover possession of the premises.  The tenant filed a declaratory relief action and the landlord filed a cross-complaint for damages and quiet

39.

title.  The trial court found for the landlord, holding the cancellation provision prevailed over the tenant's option to extend the lease.  On appeal, the judgment quieting title in the landlord was affirmed.  (*Id*. at p. 220.)  The appellate court relied upon *Staub Shoe* to conclude the tenant had failed to establish a forfeiture occurred when the lease was cancelled.  (*11382 Beach Partnership v. Libaw, supra,* at pp. 217-218.)

Based on these cases, we conclude that a when a commercial lease contains a clause terminating the lease upon the occurrence of contingencies that (1) are agreed upon by sophisticated parties and (2) have no relation to any act or default of the parties, no forfeiture results from the exercise of the termination clause.  This specific rule of law controls over the general test usually applied to determine if a contract provision is an unenforceable penalty.  In others words, the law declares that certain termination provisions do not create a forfeiture and, therefore, those provisions cannot be deemed unenforceable penalties or a forfeiture from which relief can be granted under Civil Code section 3275.

B.     Application of Law to Facts of This Case

The facts of this case show that the foregoing rule regarding termination provisions in commercial leases applies to the termination provision in section 6.1.3(b) of the Lease.  First, Ross's right to terminate the lease was based on contingencies (i.e., conditions) that were agreed upon by sophisticated parties.  Second, the conditions that triggered the right to terminate had no relation to any act or default of the parties because, when the Lease was made, neither Ross nor Grand Prospect could control whether Mervyn's continued to operate a store in the shopping center or whether that space would be occupied by the type of anchor tenant specified in the Lease.

Because these facts are not disputed, the application of the rule set forth in *Staub Shoe* and confirmed in subsequent cases presents a question of law.  (See *Weakly-Hoyt v. Foster* (2014) 230 Cal.App.4th 928, [application of law to undisputed facts presents a question of law subject to de novo review].)  Pursuant to that rule, we conclude the

40.

termination provision exercised by Ross did not cause a forfeiture. Therefore, the trial court committed legal error when it concluded (1) the termination provision was unenforceable, (2) the termination provision could be severed from the Lease, (3) Ross breached the Lease by exercising the option to terminate the Lease, and (4) this breach of the Lease entitled Grand Prospect to recover damages resulting from the termination of the lease. The proper conclusion is that the termination provision is valid and Ross could rely on it to terminate the Lease.

Correcting this legal error is straightforward because the special verdict form completed by the jury separated Grand Prospect's damages before termination from the other items of damage. Consequently, this court can modify the judgment by implementing the jury's finding as to the worth of the unpaid rent earned at the time of termination ($672,100) from the three other categories of damages that should not have been awarded.

## DISPOSITION

The amended judgment filed April 18, 2013, is modified such that the reference to "the sum of $3,785,714.86" shall be reduced to "the sum of $672,100.00" and the reference to "a total award of $4,701,990.83" shall be reduced to "a total award of $1,588,375.97." As modified, the amended judgment is affirmed.

The parties shall bear their own costs on appeal.

_____
Franson, J.

WE CONCUR:

_____
Kane, Acting P.J.

_____
Peña, J.

41.