Filed 8/28/23  Bonilla v. Reiter Berry Farms CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANTONIO BONILLA et al., | H050268 |
| Plaintiffs and Respondents, | (Santa Cruz County Super. Ct. No. 21CV02962) |
| v. | |
| REITER BERRY FARMS, INC., | |
| Defendant and Appellant. | |

Plaintiffs Antonio Bonilla and Roberta Sanchez filed a class action lawsuit against defendant Reiter Berry Farms, Inc. (Reiter), involving a number of claims regarding their employment with Reiter from 2019 through 2021.  Reiter subsequently filed a motion to compel arbitration.  The trial court found Reiter had failed to prove the existence of valid agreements to arbitrate the dispute for any of the years that Bonilla and Sanchez had worked for Reiter.  The trial court also ruled that the agreements were procedurally and substantively unconscionable.  Reiter now appeals the trial court's denial of its motion with respect to the validity and unconscionability of the 2019 arbitration agreements.

Even if we presume the trial court erred regarding the existence of valid arbitration agreements, we conclude that Reiter has not shown the trial court erred in its finding of unconscionability and affirm the order.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Lawsuit and Allegations

Husband Bonilla and wife Sanchez were employed as seasonal workers for Reiter Berry Farms beginning in 2019.  Bonilla and Sanchez both worked for Reiter until September 2021, when Reiter terminated their employment.

On December 10, 2021, Bonilla and Sanchez filed a class action lawsuit against Reiter for damages, injunctive relief, declaratory relief, penalties, and restitution.  In their complaint, Bonilla and Sanchez alleged a number of causes of actions against Reiter, including failure to pay their wages for all hours worked, failure to provide compliant breaks for meal periods and rest, failure to provide accurate wage statements, failure to pay all wages due upon separation, and violation of California's Unfair Competition Law.

### B. Reiter's Motion to Compel Arbitration

On May 20, 2022, Reiter filed a motion to compel arbitration of Bonilla's and Sanchez's individual claims and dismiss all class claims.  In its motion, Reiter contended that like all of its employees, Bonilla and Sanchez signed arbitration agreements for all the years they had worked at Reiter.  Reiter indicated that at the start of each season, it held a two-hour orientation session for all seasonal employees, during which arbitration was discussed as part of an orientation video.  Reiter stated the orientation video was in Spanish, approximately 33 minutes long, and included an arbitration agreement section which lasted approximately four minutes.  Reiter also claimed that all employees were given the opportunity to ask questions of the human resources personnel conducting the orientation.

---

[1] Reiter's initial petition was based on alleged arbitration agreements for 2019, 2020, and 2021, which were addressed and denied by the trial court.  As Reiter only challenges the trial court's findings regarding the 2019 arbitration agreements, we recount the facts relevant to those agreements only.

Reiter asserted that the arbitration agreements were presented to both Bonilla and Sanchez at their 2019 seasonal orientation and that they had signed the agreements under the names they were using at the time. Reiter also claimed that these agreements were presented to them in Spanish because they spoke and read Spanish.

In support of its motion, Reiter provided photocopies of the signed 2019 agreements bearing the parties' purported handwritten signatures as well as their signed acknowledgment of an accompanying document entitled "Arbitration Procedure Explanation." Reiter also provided a declaration from its custodian of records, Maria Olivares, who confirmed that she had located these documents from Bonilla's and Sanchez's personnel files for 2019. Olivares further confirmed that Reiter regularly showed an orientation video in Spanish to its employees at the start of the season, which included a four-minute discussion of the arbitration agreement.

### C. *Bonilla's and Sanchez's Opposition*

On June 27, 2022, Bonilla and Sanchez filed an opposition to Reiter's motion to compel arbitration. Bonilla and Sanchez argued that the circumstances surrounding them allegedly signing the arbitration agreements in 2019 constituted clear coercion.

Bonilla asserted that he had not attended any orientation prior to beginning his employment with Reiter for the 2019 season and was sent to the field to work without completing any paperwork. Bonilla claimed that while he was working in the field on his first day, the ranch manager, Rebecca Murillo, provided him with a number of documents to sign. He contended that he was told to sign the documents but was not given an opportunity to read or review the documents or ask Murillo any questions. In addition, Murillo did not discuss or explain any of the documents to him. Further, Murillo did not provide him with a copy of the documents, discuss arbitration, or mention an arbitration agreement. Bonilla claimed that he was told that he was required to sign the documents in order to work and therefore did so because he was dependent on his wages and could not afford to be unemployed. Bonilla indicated that he only had a fifth-grade education

3

with limited understanding of certain things as they relate to written language and did not understand what he was signing.

While Sanchez recalled attending a seasonal orientation in May 2019, she claimed that the orientation video only discussed sexual harassment and hostile work environments and did not include any reference to arbitration or arbitration agreements. Sanchez also contended that arbitration was not separately discussed at the orientation session by the personnel in attendance. Sanchez indicated that at the conclusion of the video, she was told to sit down with a Reiter staff member, who presented her with a stack of documents to sign. She was told to sign quickly as there were many other people to process, and her documents needed to be completed before she could be processed and begin working. Sanchez asserted that she was not given an opportunity to ask questions, read or review the documents, and none of the documents were explained or discussed with her. The staff member also did not discuss arbitration or an arbitration agreement with her. Like Bonilla, Sanchez indicated that she only had a fifth-grade education with limited understanding of written language and did not understand what was put in front of her to sign.

Bonilla and Sanchez additionally submitted several evidentiary objections to Olivares's declaration. In particular, Bonilla and Sanchez objected to Olivares's statements regarding the orientation process and video on the grounds that she simply stated general practices but had no personal knowledge of whether Bonilla or Sanchez attended orientation in 2019 and what specifically occurred with respect to any discussions or signing of the arbitration agreements. Bonilla and Sanchez also objected to Olivares's statement that she located signed agreements from 2019 in both of their personnel files, arguing that she could not authenticate that either Bonilla or Sanchez voluntarily signed the documents or the circumstances surrounding any signatures. Bonilla and Sanchez therefore argued that the 2019 agreements were inadmissible because they constituted hearsay, and Olivares failed to provide any foundational facts

4

necessary under Evidence Code section 1400, namely, that the parties had signed the documents.[2] Bonilla and Sanchez also claimed that in the absence of any declarations from anyone who actually witnessed what took place at the 2019 orientation, there was no admissible evidence with sufficient foundation to show plaintiffs signed the alleged agreements or did so without coercion.

Bonilla and Sanchez further argued that even if the trial court found valid arbitration agreements existed, the agreements were both procedurally and substantively unconscionable. Bonilla and Sanchez claimed that the circumstances surrounding them signing the 2019 documents demonstrated a "high degree" of procedural unconscionability because: (1) they were pressured into signing quickly, (2) there was a clear inequality in bargaining power because of Bonilla's and Sanchez's status as low-income workers who were dependent on their employment for wages, (3) there was no meaningful negotiation of the terms as the agreements were pre-printed, (4) the terms of the arbitration agreement were complex and difficult to understand, particularly given Bonilla's and Sanchez's limited education, and (5) no attorney assisted them in reviewing the agreements prior to signing.

Bonilla and Sanchez also argued that the actual terms of the arbitration agreements were substantively unconscionable as there was no information provided about how to initiate a claim and what arbitration rules applied to the proceedings. There was also conflicting information about which arbitration company to use as the agreements provided a list of suggested companies in one paragraph, but indicated in a subsequent paragraph that arbitrators were to be selected from a list provided by the Office of Federal Mediation and Conciliation Services, which did not include the companies

---

[2] This section provides that a writing can be authenticated in one of two ways: "(a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."

previously mentioned.  Bonilla and Sanchez therefore claimed that the agreements should be voided.

### D.  Reiter's Reply

In reply to Bonilla's and Sanchez's opposition, Reiter claimed that while both plaintiffs claimed their signatures had been coerced, they did not dispute that they had signed the 2019 arbitration agreements or challenge the authenticity of their signatures. Reiter therefore argued that it had successfully demonstrated the existence of valid arbitration agreements covering the claims in the class action complaint.

Reiter also argued that there was insufficient evidence demonstrating that the agreements were procedurally or substantively unconscionable.  Reiter claimed that neither party indicated they asked for time to read the documents prior to signing and were denied this opportunity, were precluded from asking questions, or were told they would not be hired if they did not sign quickly.  Reiter additionally contended that both parties never claimed they were unable to understand the arbitration agreements and simply chose not to read what they signed, which was not sufficient to establish procedural unconscionability.  Reiter further argued that Bonilla and Sanchez misstated the terms of the agreements, which provided clear instructions on how to initiate arbitration and which agency to use.

In connection with its reply, Reiter submitted additional declarations from other employees who had allegedly attended the same 2019 orientation as Sanchez and confirmed that the orientation video included a discussion of company policies and the arbitration agreement.  These employees also confirmed that they were allowed to ask questions and review documents.  Reiter also submitted a declaration from Murillo, the ranch manager who provided Bonilla with documents to sign in the field in 2019. Murillo confirmed that her signature appeared on the arbitration agreement signed by Bonilla.  Murillo also indicated that when she assisted employees in completing their hire packets on the ranch, her practice was to review each document with the employees and

6

explain what they were signing, ask them if they had any questions, provide them with sufficient time to review the documents, provide them with copies of all documents, and read any documents out loud if requested to do so.

### E.  The Trial Court's Ruling

On July 8, 2022, the trial court issued a tentative ruling finding that Reiter had failed to meet its burden of proof to demonstrate that valid arbitration agreements existed. With respect to the 2019 agreements, the trial court sustained Bonilla's and Sanchez's evidentiary objections to Olivares's statements that she located the signed agreements in their personnel files, on the grounds that the statements lacked foundation and authentication.  The trial court also indicated that contrary to Reiter's assertions, Bonilla and Sanchez never admitted to signing the agreements but only indicated they had signed a stack of documents.  The court additionally found that the circumstances surrounding the signing of the documents, as described by Bonilla and Sanchez, amounted to coercion.  The trial court noted that Reiter did not provide any evidence regarding the specific circumstances surrounding the signing of the 2019 agreements that rebutted Bonilla's and Sanchez's description of those events.

The trial court also stated that Olivares's declaration, as well as declarations submitted by other Reiter staff members, did not specifically indicate that staff members went over the "complex, two page, single spaced arbitration agreement" with employees. The trial court concluded that even if Sanchez had viewed the video in 2019 and heard the description of the arbitration agreement therein, the information provided in the video, as per the transcript provided by Reiter, was inconsistent with the terms in the actual written arbitration agreements.  In particular, there were discrepancies about the selection of the arbitrator and applicable arbitration rules, and the video "fail[ed] to explain that any and all disputes regarding employment are subject to arbitration; that the employee is waiving the right to a jury trial; and that the employee is waiving the right to bring class and/or representative actions."

7

The trial court also declined to consider the declarations submitted by Reiter in its reply, which it labeled as "late filed" evidence. Even so, the court noted that out of the five reply declarations submitted, only Murillo's declaration contained information regarding Bonilla's signing, and none of them addressed the specific circumstances surrounding Sanchez's signing.

Because Reiter had not met its burden of establishing that valid arbitration agreements existed, the trial court indicated that it did not need to rule the issue of unconscionability. Nevertheless, the court still determined that Bonilla and Sanchez provided sufficient evidence of procedural and substantive unconscionability to support recission of the agreements. The court stated that while Bonilla and Sanchez may have been unilaterally mistaken in not understanding or being aware of the arbitration agreements at the time of signing, the evidence demonstrated that Reiter was not only aware of but also fostered this mistake through the procedures and methods used to obtain Bonilla's and Sanchez's signatures. The court also found that Bonilla's and Sanchez's lack of consent to the agreements reflected procedural unconscionability. Although the court found the issue of substantive unconscionability less clear, it indicated that there was sufficient evidence to support a finding of substantive unconscionability, citing the confusing information on how to initiate arbitration as well as the lack of clarity on which company the arbitrator will be selected from and which arbitration rules apply. The court further indicated that the agreements limited injunctive relief requests to the Office of Federal Mediation and Conciliation Service, which created the potential for requiring litigation in two different forums.

On July 11, 2022, the court heard argument from Reiter contesting the tentative ruling. The court subsequently adopted its tentative ruling as an order of the court, which was filed on July 19, 2022.

Reiter timely appealed the trial court's order.

8

## II.    DISCUSSION

Reiter argues that the trial court (1) erred in finding that it did not meet its burden of proving the existence of valid arbitration agreements that applied to the claims raised by Bonilla and Sanchez, (2) abused its discretion in excluding the declarations submitted in its reply, and (3) erred in finding the arbitration agreements were procedurally or substantively unconscionable.

### A.    *Applicable Law and Standard of Review*

While there is a strong public policy favoring contractual arbitration, this policy only extends to parties who have agreed to arbitrate.  (*Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 165 (*Gamboa*).)  In fact, there is no public policy "that favors the arbitration of disputes the parties did not agree to arbitrate." (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890.)  When hearing a motion to compel arbitration, the trial court must first determine whether a valid agreement to arbitrate exists.  (See Code Civ. Proc., § 1281.2; *Gamboa*, *supra*, at p. 164.)  The court makes this determination using a summary process.  (See Code Civ. Proc., § 1290.2.)  " '[T]he trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination.' " (*Gamboa*, *supra*, at p. 164, quoting *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

The party seeking to compel arbitration has the initial burden to demonstrate the existence of an arbitration agreement by a preponderance of the evidence.  (*Gamboa*, *supra*, 72 Cal.App.5th at pp. 164-165.)  However, this burden may shift into a three-step process.  First, the moving party must produce prima facie evidence of the written arbitration agreement by either attaching to the motion a copy of the agreement purporting to bear the opposing party's signature, or by setting forth the agreement's provisions in the motion.  (*Id.* at p. 165.)  Second, if the opposing party disputes the agreement, as is the case here, the burden then shifts to the opposing party to challenge

9

the authenticity of the agreement.  (*Ibid*.)  Third, if the opposing party meets that burden, the burden returns to the moving party to establish "with admissible evidence" that a valid arbitration agreement exists between the parties, by a preponderance of the evidence.  (*Id*. at pp. 165-166.)

The parties dispute the appropriate standard of review for this case.  Reiter asserts that although the standard of review of an order denying a motion to compel arbitration is generally abuse of discretion, the relevant facts in this case are undisputed and therefore a de novo review is appropriate.  Bonilla and Sanchez argue that appellate review of an order denying a motion to compel arbitration is subject to substantial evidence where a decision is made based upon disputed facts.

" ' "There is no uniform standard of review for evaluating an order denying a motion to compel arbitration." ' "  (*Fabian v*. *Renovate America*, *Inc*. (2019) 42 Cal.App.5th 1062, 1066 (*Fabian*).)  We review any findings of fact for substantial evidence.  (*Gamboa*, *supra*, 72 Cal.App.5th at p. 166.)  "Where the decision 'is based on the court's finding that [the party seeking arbitration] failed to carry its burden of proof, the question for the reviewing court is whether that finding is erroneous as a matter of law.' "  (*Ibid*.)  In that regard, we must determine whether the moving party's evidence was uncontradicted and unimpeached, and " ' " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' "  (*Fabian, supra,* 42 Cal.App.5th at p. 1067.)

We view " ' "all factual matters most favorably to the prevailing party and in support of the judgment.  [Citation.]  ' "All conflicts, therefore, must be resolved in favor of the respondent." ' " ' "  (*Gamboa*, *supra*, 72 Cal.App.5th at pp. 166-167.)

### B.  *The Trial Court's Order Denying the Motion to Compel Arbitration*

Reiter claims the trial court erred in denying its motion to compel arbitration. Reiter argues that it satisfied its burden of proof demonstrating that valid arbitration agreements existed, and the trial court should have evaluated Bonilla and Sanchez's

10

arguments in opposition as defenses to enforcement, not challenges to the validity of the agreements.

### 1. Validity of the 2019 Arbitration Agreement

Reiter claims that the trial court improperly excluded the 2019 agreements from evidence for lack of authenticity. Reiter argues that for the purposes of meeting its initial burden, it was not required to prove authenticity but simply had to attach copies of the agreements to its motion.

Although the petitioner is not required to authenticate an opposing party's signature on an arbitration agreement in its initial petition, the analysis does not end there when the opposing party challenges the authenticity of the signature. (*Ruiz v. Moss Bros Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 846.) While Reiter may have adequately met the first step of its burden by producing copies of the agreements with its petition, we disagree with its assertion that the trial court was required to admit them into evidence at that point. Instead, the burden shifted to Bonilla and Sanchez to challenge the authenticity of the agreements. (*Gamboa*, *supra*, 72 Cal.App.5th at pp. 164-165.)

Turning to this second step of the three-step process described above, courts have disagreed as to whether a plaintiff's failure to remember signing an arbitration agreement is sufficient to raise a dispute as to the authenticity of the agreement. (See *Gamboa, supra,* 72 Cal.App.5th at p. 167 [holding that a plaintiff can successfully challenge the authenticity of an agreement by stating that she did not recall signing the agreement and would not have signed if she had been aware of the agreement's contents]; but also see *Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 757-758 (*Iyere*) [rejecting *Gamboa* and holding that authenticity is not successfully challenged by a plaintiff's failure to recall signing an agreement and assertion that she would not have signed if aware of the agreement's contents].)

11

In *Gamboa*, the Second Appellate District concluded that a successful challenge to the authenticity of an arbitration agreement can result from an opposing party's declaration, under penalty of perjury, that they did not recall the arbitration agreement and would not have signed it if they had been aware of it. (*Gamboa*, *supra*, 72 Cal.App.5th at p. 167.) Here, similar to the opposing party in *Gamboa*, Bonilla and Sanchez stated under penalty of perjury that they did not recall signing arbitration agreements. However, unlike the opposing party in *Gamboa*, there was no declaration by Bonilla and Sanchez that had they been aware of the existence of the arbitration agreement, and been explained its provisions, they would not have signed such agreements. (See *ibid.*) Bonilla and Sanchez simply declared that they were only told to sign a stack of documents, the contents of which were not explained to them. Although such facts are distinguishing, the *Gamboa* court found that "[i]t was enough that [opposing party] challenged the authenticity of the agreement by saying under penalty of perjury that she did not remember it." (*Gamboa*, *supra*, 72 Cal.App.5th at p. 168.)

Reiter claims that Bonilla and Sanchez failed to meet their burden to challenge the authenticity of the agreements, referencing the recent holding in *Iyere*. In that case, the First Appellate District rejected the holding in *Gamboa* that an opposing party's failure to recall signing an arbitration agreement was sufficient to challenge the agreement's authenticity. (*Iyere*, *supra,* 87 Cal.App.5th at pp. 757-758.) The *Iyere* court reasoned that because a handwritten signature, such as the one on the purported agreement in *Gamboa*, could be easily recognized or rejected as authentic, "the fact that that person does not recall signing the agreement neither creates a factual dispute as to the signature's authenticity nor affords an independent basis to find that a contract was not formed." (*Id.* at p. 758.) The *Iyere* court also rejected the contention that a plaintiff can successfully challenge the authenticity of an arbitration agreement by claiming he or she would not have signed if aware of the contents, noting that it is "hornbook law" that failure to read

12

an agreement prior to signing does not prevent the formation of a contract. (*Id.* at p. 759.)

Reiter's argument that the facts in the instant case closely match those in *Iyere* is well-taken. Like the plaintiffs in *Iyere*, Bonilla and Sanchez signed a stack of documents, did not deny that this stack included an arbitration agreement, and did not deny that the signatures on the documents were theirs. Accordingly, under the holding in *Iyere*, Bonilla and Sanchez arguably did not meet their burden to successfully challenge the authenticity of the agreement.

Although we recognize this split in authority, we need not decide whether to agree with the approach taken in *Gamboa* or *Iyere*. As discussed below, even if we assume the trial court erred in determining that valid arbitration agreements did not exist, there was substantial evidence to support the trial court's finding of procedural and substantive unconscionability.[3]

### 2. *Unconscionability of the 2019 Agreements*

"Both procedural and substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.' [Citation.] Instead, they are evaluated on a " 'sliding scale.' " [Citation.] 'The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to' conclude the term is unenforceable. [Citation.] Conversely, the more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required." (*OTO, LLC v. Kho* (2019) 8 Cal.5th 111, 125-126 (*OTO*).) The burden of proving unconscionability rests on the party asserting it. (*Id.* at p. 126.)

---

[3] Because we proceed under the assumption that either Bonilla and Sanchez did not meet their burden of challenging authenticity (under the second step) or that Reiter could prove that a valid arbitration agreement existed (under the third step), we need not decide if the trial court abused its discretion in excluding the reply declarations submitted by Reiter to prove the validity of the agreements.

While Reiter contends that the standard of review for an unconscionability determination is de novo, this is only when the evidence is not in conflict. (See *OTO*, *supra*, 8 Cal.5th at p. 126.) Here, as discussed below, the parties dispute the underlying facts surrounding the circumstances under which the agreements were entered into. "[W]he[n] an unconscionability determination 'is based upon the trial court's resolution of conflicts in the evidence, or on the factual inferences which may be drawn therefrom, we consider the evidence in the light most favorable to the court's determination and review those aspects of the determination for substantial evidence.' " (*Samaniego v. Empire Today*, *LLC* (2012) 205 Cal.App.4th 1138, 1144.)

### a.  Procedural Unconscionability

Procedural unconscionability " 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.' " (*OTO*, *supra*, 8 Cal.5th at p. 125.) "A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' " (*Id.* at p. 126, quoting *Armendariz v. Foundation Health Psychcare Services*, *Inc.* (2000) 24 Cal.4th 83, 113 (*Armendariz*).) "An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, at p. 126, quoting *Baltazar v. Forever 21*, *Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*).) "Arbitration contracts imposed as a condition of employment are typically adhesive." (*OTO*, *supra*, at p. 126, citing *Armendariz*, *supra*, at pp. 114-115; *Serpa v. California Surety Investigations*, *Inc.* (2013) 215 Cal.App.4th 695, 704.) The "pertinent question . . . is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required." (*OTO*, *supra*, at p. 126; *Baltazar*, *supra*, at pp. 1245-1246.) " ' "*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form." ' " (*Pinnacle Museum*

14

*Tower Assn. v. Pinnacle Market Development* (*US*), *LLC* (2012) 55 Cal.4th 223, 247, italics added, (*Pinnacle*).)

"The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney." (*OTO*, *supra*, 8 Cal.5th at pp. 126-127, quoting *Grand Prospect Partners*, *L.P. v. Ross Dress for Less*, *Inc.* (2015) 232 Cal.App.4th 1332, 1348, fn. omitted.) Regarding arbitration contracts executed prior to commencing employment, courts have observed that "the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (*Armendariz*, *supra*, 24 Cal.4th at p. 115.)

Reviewing the evidence in the light most favorable to the prevailing party, and considering the *OTO* factors, we find that there was substantial evidence to support the trial court's finding that the arbitration agreements were procedurally unconscionable. Neither party disputes that Reiter's arbitration agreement, which was a standardized agreement provided to all employees, constituted a contract of adhesion. In addition, as the trial court noted, the circumstances surrounding both Bonilla's and Sanchez's signing of documents amounted to coercion, thus reflecting a lack of negotiation and meaningful choice. (See *Pinnacle, supra,* 55 Cal.4th at p. 247.)

Applying the *OTO* factors as discussed above, both Bonilla and Sanchez indicated that they were given a very minimal amount of time to consider the proposed contract. When Sanchez was provided the documents, many people were in line waiting to be processed so as to begin work promptly. Even more constrained for time, Bonilla was

15

already in the field working when the documents were presented to him. In addition, neither of them were given time to review the documents or ask questions, or given copies of the documents to take home. Both parties were also pressured into signing quickly as a result of their work being conditioned on completing the agreements. Sanchez herself was even told to "sign quickly" to allow other workers to be processed after her. The arbitration agreement was printed in small, single-spaced block print with sentences up to eleven lines long using complicated legal jargon, nestled among many other documents in a large stack. While the agreements were in Spanish, both Bonilla and Sanchez stated that they only had a fifth-grade education and limited skills related to understanding written language. Finally, no attorney was present to assist them with reviewing and understanding the agreements. These circumstances all reflect oppression as defined by *OTO*. Accordingly, we find no error in the trial court's finding regarding procedural unconscionability.

### b. *Substantive Unconscionability*

"Substantive unconscionability examines the fairness of a contract's terms. This analysis 'ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as [overly harsh, unduly oppressive, so one-sided as to shock the conscience, or unfairly one-sided].' " (*OTO*, *supra*, 8 Cal.5th at p. 129.) "Unconscionable terms 'impair the integrity of the bargaining process or otherwise contravene the public interest or public policy' or attempt to impermissibly alter fundamental legal duties. [Citation.] They may include fine-print terms, unreasonably or unexpectedly harsh terms regarding price or other central aspects of the transaction, and terms that undermine the nondrafting party's reasonable expectations." (*Id*. at p. 130.)

As previously noted, an agreement reflecting a high degree of procedural unconscionability requires a lesser showing of substantive unconscionability. (*OTO*, *supra*, 8 Cal.5th at pp. 125-126.) "[S]ubstantive terms that, in the abstract, might not support an unconscionability finding take on greater weight when imposed by a

procedure that is demonstrably oppressive." (*Id*. at p. 130.) Additionally, ' "[g]iven the lack of choice and the potential disadvantages that even a fair arbitration system can harbor for employees, we must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms as part of an arbitration agreement." ' (*Carmona v. Lincoln Millennium Car Wash, Inc*. (2014) 226 Cal.App.4th 74, 85, quoting *Armendariz*, *supra*, 24 Cal.4th at p. 115.) Accordingly, given the substantial procedural unconscionability in the circumstances under which Bonilla and Sanchez signed the agreements, the trial court only needed to find a "relatively low degree" of substantive unconscionability to deem the agreements unenforceable. (See *OTO, supra,* 8 Cal.5th at p. 130.)

Again, evaluating all facts in the light most favorable to the prevailing party, there was substantial evidence demonstrating that the terms of the agreements were substantively unconscionable. As discussed below, the arbitration agreements contained confusing instructions on how to initiate the arbitration process and lacked clarity regarding which arbitration rules applied, both of which could ultimately deter a party from raising a valid claim and impair the accessibility of the arbitration process.

In responding to the trial court's determination that the arbitration agreements gave "confusing information as how to initiate arbitration, as required by *OTO*," Reiter claims that the information can be found in a provision indicating that "[a]ny claim by one party against the other that could be presented as a resolution in accordance with this paragraph must be presented in writing by the claimant." However, we note that this language does not provide sufficient clarity on how to initiate a complaint, as it simply says to do so in writing but does not provide any information on where or to whom to submit this written complaint, or what specifically must be contained in the written complaint to initiate the arbitration process. Further, as many commercial arbitration providers utilize standardized forms to begin the arbitration process, it is unclear whether the term "in writing" refers to these standardized forms or something else. (See *OTO,*

17

*supra,* 8 Cal.5th at p. 131.)  This lack of clarity in how to initiate and pursue arbitration supports the trial court's finding that the agreements were substantively unconscionable because it could unreasonably benefit the employer by deterring an employee from attempting to initiate a legitimate claim.  (See *OTO, supra,* 8 Cal.5th at p. 129.)

The provisions regarding which rules would apply are equally problematic.  The trial court found that the arbitration agreements did not make "clear which company the arbitrator will be selected from [and] which arbitration rules apply."  We agree.  The agreements first indicate that "arbitration will be conducted according to the rules of the arbitration association or service through which the arbitrator is selected (e.g., American Arbitration Association, JAMS, ARS, or others)" but later state that "[t]he arbitrator will be selected from a list of seven (7) arbitrators supplied by the Office of the Federal Mediation and Conciliation Service."  This lack of clarity in the agreements as to which arbitration rules apply, combined with the confusing information on how to initiate the arbitration process, could result in employees being so unsure of how to make a claim and what the rules would be going forward, that "they are deterred from bringing their . . . claims at all."  (*OTO*, *supra*, 8 Cal.5th at pp. 130-131.)  As a result, these terms as a whole would impede the accessibility of the arbitration process and unreasonably benefit the employer.  (See *ibid.*)

In making our ruling, we consider Reiter's argument that the agreement contains language stating that arbitration will be conducted pursuant to Code of Civil Procedure section 1280, et seq (also known as the California Arbitration Act).  However, this section only pertains to the applicable procedures for enforcing an arbitration agreement and conducing arbitration proceedings.  It contains no language regarding the initiation of the arbitration process.  In addition, the inclusion of such language does not rectify the inconsistent language above referencing multiple different rules that could potentially apply to the proceedings.  Reiter claims that there is no requirement to include instructions on how to initiate arbitration, citing *Fuentes v. Empire Nissan, Inc.* (2023) 90

Cal.App.5th 919 (*Fuentes*).  However, *Fuentes* only states that failure to include such information does not render an agreement substantively unconscionable if the agreement specifies what arbitration rules apply.  (*Id.* at p. 934.)  It does not address the issue of unclear or confusing language regarding initiation of a claim, nor does it discuss whether the terms are rendered unconscionable if the agreement does *not* clearly specify which arbitration rules apply.

In conclusion, we find that substantial evidence supported the trial court's finding that the arbitration agreements were procedurally and substantively unconscionable, and therefore subject to recission.

### III.    DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed. Bonilla and Sanchez are awarded their costs on appeal.

_____
Wilson, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Danner, J.

Bonilla et al. v. Reiter Berry Farms, Inc.
H050268